SHEPARD *et al.* *v.* NORTHWESTERN LIFE INS. Co. *et al.*

(*Circuit Court, E. D. Michigan.* September 2, 1889.)

1. INDIAN TREATIES—TIME OF TAKING EFFECT.
    Where an Indian treaty provided that it should be obligatory as soon as the same should be ratified by the president and senate, *held*, that it did not take effect until signed by the president, although it had been previously ratified by the senate, and accepted by the Indians.
2. PUBLIC LANDS—RAILROAD GRANTS—WHEN OPERATIVE.
    While the act of June 3, 1856, granting certain public lands to the state of Michigan for railroad purposes, was intended as a present grant of the lands included in its terms, no further conveyance by the government being contemplated, yet the grant did not become operative or divest the title of the United States to any particular lands until they had been earned by the building of a certain number of miles of road, and selected by the railroad company. Such act, however, did not attach to lands which, at the date of the act, had been reserved to the United States.
3. SAME—TITLE OF INDIANS.
    Where the title of the Indians and their right of occupation of certain lands had been fully extinguished, it was *held* that they passed under this act, notwithstanding that they were held by the United States in trust to sell them for the benefit of the Indians.
4. SAME.
    But, even if these lands did not pass under the act, it was held that the defendant, who had taken possession and claimed title under the same act, was estopped to set up this fact. The doctrine of common source is applicable.

**5. SAME—RAILROAD GRANTS—FORFEITURE.**

Defendants in this case claimed title under a deed from the Amboy, Lansing & Traverse Bay Railroad Company, the original grantee of the land under the act of congress. Plaintiff claimed under a deed from the Jackson, Lansing & Saginaw, which had succeeded to the rights of the Amboy Company upon its failure to perform the conditions of the grant. *Held,* (1) that the Amboy Company had never earned the lands in question, and that its deed to defendants was inoperative to pass the title; (2) that congress, by an act of July 3, 1866, had elected to forfeit the right of the Amboy Company to the lands then unearned, upon its failure to perform certain conditions, and, upon such failure, had authorized the state legislature to confer the grant upon some other corporation; (3) that the Amboy Company failed to perform such conditions, and the legislature thereupon conferred its grant upon the Jackson Company, under an arrangement to that effect between the two companies; (4) that, even if no forfeiture was intended, the acts of the legislature and of the two companies operated as a surrender by the Amboy Company of its rights, and the investiture of such rights in the Jackson Company; (5) that the Jackson Company was not the mere assignee of the Amboy Company, and did not take the unearned lands subject to its conveyances; and hence that patents of these lands, subsequently issued to such company, did not inure to the benefit of the grantees of the Amboy Company.

(*Syllabus by the Court.*)

At Law.

This was an action of ejectment to recover the S. W. ¼ of section 9, township 14 N., range 5 E. At the time the suit was begun, the land was in the possession of the defendant Clark, under a lease from his co-defendant, the Northwestern Life Insurance Company.

Plaintiffs claimed title under an act of congress approved June 3, 1856, granting certain public lands to the state of Michigan to aid in the construction of certain railroads. 11 St. at Large, 21. These lands were subsequently patented to the Jackson, Lansing & Saginaw Railroad Company, (which, for convenience, will be called the "Jackson Company,") as successors of the Amboy, Lansing & Traverse Bay Railroad Company, (which will be called the "Amboy Company,") and passed by deed of the prior company to plaintiffs, May 5, 1869.

Defendant' claimed under the same act, and under a deed from the Amboy Company to Maxwell, Campbell, and Van Etten, dated November 28, 1855; a deed from Campbell and Van Etten to Maxwell, dated August 5, 1868; and subsequent conveyances to the Northwestern Life Insurance Company, the main defendant in this case.

Upon the trial of this case at the October term, at Bay City, a jury was impaneled to try the only question of fact involved, viz., whether defendants had been in the undisputed possession of the property for 15 years prior to the commencement of the suit. To this question the jury responded in the negative. The case was thereupon, by consent of counsel, taken from the jury, and submitted to the court, to be tried as a question of law upon the undisputed testimony.

The facts of the case are substantially as follows: By a treaty with the Chippewa Indians, signed September 24, 1819, (7 St. at Large, 203,) there were "reserved for the use of" these Indians 40,000 acres of land out of a large quantity ceded to the United States, and it was admitted that the land in question lay within this reservation. This tract, which by the treaty was "to be hereafter located" on the west side of the Saginaw river, was actually located and surveyed in the following year. By

a subsequent treaty, made in 1837, (7 St. at Large, 528,) this tract was ceded to the United States; the latter agreeing to pay the Indians, in consideration of such cession, "the net proceeds of the sales thereof, after deducting the expense of survey and sale, together with the incidental expenses of this treaty." By a subsequent treaty, negotiated August 2, 1855, but not signed by the president until June 21, 1856, (11 St. at Large, 631,) the Chippewas ceded to the United States absolutely "all the lands within the state of Michigan heretofore owned by them as reservations, and whether held for them in trust by the United States or otherwise;" releasing and discharging the United States "from all liability to them" "for the price and value of all such lands heretofore sold, and the proceeds of which remain unpaid."

By an act of congress approved June 3, 1856, (11 St. at Large, 21,) after the treaty and its amendments had been accepted by the Indians, but before it had been signed by the president, certain lands were granted to the state of Michigan to aid in the construction of certain railroads from and to certain points therein specified, and, among others, from Amboy, by Hillsdale and Lansing, to some point on or near Traverse bay. The grant covered "every alternate section of land designated by odd numbers, for six sections in width on each side of each of said roads; but in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any section, or any part thereof, granted as aforesaid, or that the right of pre-emption has attached to the same," it was provided other lands should be selected nearest to the tiers of sections above specified as should be equal to such as had been sold or appropriated: provided, "that the lands hereby granted shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever: and provided, further, that any and all lands heretofore reserved to the United States by any act of congress, or in any other manner, by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operations of this act," etc. The third section declared that "the said lands hereby granted to the said state shall be subject to the disposal of the legislature thereof for the purposes aforesaid, and no other;" and the fourth, that "the lands hereby granted to said state shall be disposed of by said state only in the manner following, *i. e.*, that a quantity of land, not exceeding 120 sections for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold; and when the governor of said state shall certify to the secretary of the interior that any 20 continuous miles of any said road is completed, then another quantity of land hereby granted, not to exceed 120 sections for each of said roads having 20 continuous miles completed, as aforesaid, and included within a continuous length of 20 miles of each of said roads, may be sold; and so, from time to time, until said roads are completed; and, if any of said roads are not completed within ten years, no further

sales shall be made, and the lands unsold shall revert to the United States."

On the 14th of February, 1857, the legislature passed an act which, referring to the grant by congress, declared that so much of the lands, franchises, rights, powers, and privileges as were, or may be, granted and conferred in pursuance thereof, to aid in the construction of a railroad from Amboy, by way of Lansing, to some point on or near Traverse bay, "are hereby disposed of, granted to, conferred upon, and vested in the Amboy, Lansing & Traverse Bay Company." The act provided for the formal acceptance of the grant by the company, and that it should be the duty of the company, on or before the 1st day of December then next, to locate the line of its railroad, and make complete maps of the line, and to file copies in the office of the governor and secretary of state, and the governor was required to transmit a duplicate to the land-office at Washington.

The seventh section of the act provided that the company, after the completion of 20 continuous miles of its road, and after the governor should have certified to the secretary of the interior that such 20 continuous miles of its road were completed, then, and not before, might sell 60 sections of land included within any continuous 20 miles of the line of its road; and in like manner, upon the completion of each other 20 continuous miles, it might sell other 60 sections; and so on, from time to time, until the whole of its road was completed. The company was required to complete the road between Hillsdale and the point of intersection with the Detroit & Milwaukee Railroad on or before the 1st of November, 1859, and at least 20 continuous miles of the road every year thereafter, until the entire road was completed; the whole to be finished by the 1st day of November, 1865. The company made acceptance in writing, November 3, 1857. It also prepared maps, located its road, and proceeded to construct a portion thereof. By the maps and location of the road, a large quantity of lands was brought within the provisions of the grant. The lands in question are located less than six miles from the line of road. The commissioner of the general land-office, at Washington, withdrew from sale large tracts of land in Michigan, covering the lands in question, by an order dated June 13, 1856; and afterwards, from time to time, made lists of the lands which were conceived to be subject to the grant, and which were approved by the secretary of the interior. These lists were filed in the land-office at Lansing. The Amboy Company commenced the construction of its road from Owosso in the direction of Lansing, and constructed in all, from first to last, some 27 miles of road, extending from Owosso to Michigan avenue, in the city of Lansing, but never constructed any part of its road north of Owosso. By an act of the legislature of February 14, 1859, the quantity of land that might be sold on the completion of 20 continuous miles of road was increased to 120 sections. On December 20, 1860, the governer certified to the completion of 20 miles of road. By an act of 1861 (Sess. Laws, p. 150) it was provided that the company should not be entitled to the second 120 sections until it should

have constructed the road, and opened it for use, from Owosso to Michigan avenue, in Lansing. On the 19th day of March, 1863, another act was passed, waiving all forfeitures, but requiring the company, within six months from the passage thereof, to finish and open their road for use to Michigan avenue, in the city of Lansing, and also, by the 1st day of June then next, to commence work in good faith on the road from Owosso to Saginaw city, and by the 1st day of January, 1865, to complete that portion thereof. There was a further proviso that the company should not "be entitled to that portion of the second 120 sections of land, not already conveyed by them," until the road should be completed and opened for use to Michigan avenue, in the city of Lansing. On the 17th of September, 1863, the governor certified to the secretary of the interior that the road was constructed and opened for use to Michigan avenue, in the city of Lansing, stating therein that he did so "in order that it may appear that the said railway company now has title to the second 120 sections of lands so granted by said act of congress and referred to in said act of the legislature of the state of Michigan, approved March 19, 1863."

Under the operation of these two certificates, the Amboy Company became entitled to 240 sections. The company prepared lists of the land to which it was thus entitled, and submitted them to the board of control of railroads, and they were approved by that board, and filed in the land-office at Lansing. These lists bear date September 3 and 4, 1861, and were executed by the officers of the railroad company, declaring the purpose and intention of the company to take these descriptions of land for and on account of the lands to which they were entitled. The Amboy Company also proceeded to sell the lands described in the lists by three deeds:

(1) A deed from the Amboy Company to Henry Day, dated November 9, 1861, covering 87,693.13 acres.

(2) A trust-deed or mortgage to Chapman and Williams, dated November 9, 1861, covering 65,275.74 acres, to secure a large amount of bonds.

(3) A deed to Halmer H. Emmons of about 80 acres, dated November 12, 1861.

Neither of the lists or deeds above mentioned embraced the lands in question in this suit, but they more than exhausted the total number of acres contained in the 240 sections to which the road was entitled.

By an act of the legislature of March 18, 1865, it was provided that it should be lawful for the Jackson Company, or any other company, to enter into an arrangement with the Amboy Company, for the location of its line of road from Lansing, by way of Owosso, to Saginaw, upon the line of the said Amboy road, and for the construction of the same on such line; and, in case of such agreement and location, then, upon the filing in the office of the secretary of state of a copy of the agreement between the companies, duly certified, said Jackson or other company should become entitled to receive, take, hold, sell, and dispose of the lands granted by congress to aid in the construction of said line of road,

as the said Amboy Company might have done under existing laws if such road from Owosso to Saginaw had been constructed by it; and the right of said Amboy road to such lands, so far as the portion of its road from Owosso to Saginaw is concerned, should cease upon the filing of said copy of agreement in the office of the secretary of state. Under the second section, full authority was conferred upon the Jackson Company to purchase, at private, public, or judicial sale, the railroad and property of the Amboy Company. On the 28th November, 1865, the Amboy Company executed a deed to Maxwell, Campbell, and Van Etten purporting to convey a considerable quantity of lands, embracing the description in question in this suit. The deed recited the legislation already referred to, including that of 1863; the construction of the road from Owosso to Lansing; the giving of the two certificates by the governor; the fact that the lands therein described were a portion of those included in the grant aforesaid, and selected between said township 6 N. and said township 18 N. The quantity covered by this conveyance was about 7,000 acres, equivalent to about 11 sections.

The next item of interest is an act of congress of July 3, 1866, (14 St. at Large, 78,) which extended the time seven years for the Amboy Company to complete its road, and again authorized the legislature to confer the grant on some other than the Amboy Company, unless—

(1) It clear, grub, and grade 20 miles of road-bed between Owosso and Saginaw by the 1st day of February, 1867; and

(2) Fully complete said 20 miles by the 1st day of November, 1867; and

(3) Fully completes 20 miles a year thereafter, and fully completes the entire road by the time limited in the act. In October, 1866, an agreement was entered into between the Amboy Company and the Jackson Company by which it was agreed on both sides that the beneficial interest in the land grant was transferred to the Jackson Company. By this agreement the Jackson road was to locate its line from Lansing, by the way of Owosso, to Bangor, upon the line of the Amboy road, and was to construct its road thereon, and to complete it, in the time and manner prescribed by the act of 1866; in consideration of which, the Amboy road bargained and sold to the Jackson road all its right, title, and interest to its line north of Owosso, together with all its interest in and to so much of the land grant as pertained to that part of the Amboy road lying north of Owosso, and in and to all lands which were applicable to aid in the construction of such line north of Owosso, "or which may be in any way acquired, taken, or sold on the completion of said road; it being understood and agreed that the Jackson Company shall take possession of the line, and construct its road thereon, and take and hold and dispose of the land grant in the same manner, in like quantity, and on the same terms and conditions as if the grant had been expressly conferred on it by said acts." On January 4, 1866, the Jackson Company had acquired the road of the Amboy Company from Lansing to Owosso by a deed executed upon foreclosure of the mortgage to Chapman and Williams. In 1867 the legislature passed an act confirm-

ing the right of the Jackson Company, and vesting it with the land grant. The Jackson Company proceeded with the construction of the railroad from Owosso north, obtained the governor's certificates of completion, and afterwards selected the lands to which it became entitled, amongst others the lands in question, and received a patent therefor from the United States, dated May 4, 1869, and afterwards conveyed the lands in question to the plaintiff in consideration of the sum of $1,600.

*H. H. Hatch* and *Theodore F. Shepard*, for plaintiffs.

*John D. Conely* and *A. C. Maxwell*, for defendants.

BROWN, J. This is one of many cases which have arisen out of the loose methods adopted by congress and the state legislatures in identifying and dealing with lands granted in aid of construction of railways. The cumbersomeness of executing patents for the large tracts of land involved in these grants has led to the practice of patenting by legislative act, leaving the lands to be selected and identified in each case by the patentee.

### THE INDIAN TITLE.

The first question in order of time, in this case, relates to the supposed want of power in the United States to make the grant of these lands under the act of June 3, 1856. It is claimed by the defendant, in this connection, that these lands, having been reserved to the Indians by treaty, were not in a condition to be granted by the United States at the time the act was passed, inasmuch as the treaty of August 2, 1855, ceding them unconditionally to the United States, was not signed until June 21, 1856, 18 days after the act was passed. It seems that on April 15, 1856, the senate ratified this treaty, with certain amendments, which were accepted by the Indians May 14, 1856, but the treaty was not finally ratified and signed by the president until June 21, 1856. Plaintiffs' theory is that the treaty took effect from the time the amendments thereto were accepted by the Indians, May 14, 1856, and that the president's act in ratifying and signing it related back to that time. But by article 4 of the treaty it was absolutely provided that "it should be obligatory and binding upon the contracting parties as soon as the same shall be ratified by the president and senate of the United States." As it was never ratified by the president until June 21, 1856, it is clear that it did not take effect until that day. Indeed, the constitution itself vests in the president the power to make treaties, by and with the advice and concurrence of the senate. As he is the treaty-making power, it is as clear that the treaty does not take effect until he signs it as that his appointees to office cannot enter upon the discharge of their duties until he has signed their commissions. His act in sending the treaty to the senate may have shown that it met his approval, but it evidently did not meet the approval of the senate, as it was returned by that body for amendment. The doctrine of relation has no application to a case of this kind, where a statute prescribes the time when the bargain shall take effect.

But we think the exact time when the treaty became operative is of no importance in this case, for the following reasons:

1. Conceding, what appears to be entirely settled, that the act of June 3, 1856, was a present grant of the lands included in its terms, devoted to a particular purpose, and that no further conveyance by the government was contemplated, (*Schulenberg* v. *Harriman*, 21 Wall. 44; *Wright* v. *Roseberry*, 121 U. S. 519, 7 Sup. Ct. Rep. 985; *Johnson* v. *Ballou*, 28 Mich. 378; *Railroad Co.* v. *Davison*, 32 N. W. Rep. 726,) it is held by the same authorities that the grant did not become operative, or divest the title of the United States to any particular lands, until they had been earned by the building of a certain number of miles of road, and selected by the railroad company. Indeed, the express language of the statute is that "in case it shall appear that the United States have, when the lines or routes of said road are definitely fixed, sold any section, or any part thereof, as aforesaid," other lands shall be selected in lieu thereof. It follows from this that if, after the passage of the act, and before the lines had been definitely fixed, the United States had sold any of the lands within the specified section, the road would be entitled to select other lands in their place. Upon the other hand, were it not for the clause to which attention is hereafter called, it would be equally true that if, within the same time, the title of the government to such lands had become perfected, the right of the road would attach to them as if the government had always held the title; in other words, that we should look solely at the state of the title when the right of selection attached, and not when the act was passed. This seems to have been the opinion of the supreme court in *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196; *Taboreck* v. *Railroad Co.*, 13 Fed. Rep. 103.

But counsel for defendants claims, in this connection, that these lands did not pass by the act of 1856 by reason of the last proviso of the first section, that "any and all lands heretofore reserved to the United States by any act of congress, or in any other manner, by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operations of this act." If the lands in question had been reserved to the United States, within the meaning of this proviso, it would seem to follow that they were not the subject of location under this act.

This consideration renders it necessary to examine the prior treaties concerning the same land. By the treaty of January 14, 1837, (7 St. at Large, 528,) the Indians ceded to the United States certain lands, including this tract, in trust "to pay to the said Indians, in consideration of the lands above ceded, the net proceeds of the sale thereof, after deducting the expense of the survey and sale, together with the incidental expenses of this treaty. The lands shall be surveyed in the usual manner and offered for sale as other public lands, at the land-offices of the proper districts, as soon as practicable after the ratification of this treaty." The treaty further provided that a special account of the sales should be kept, and the balance invested, under the direction of the president,

"in some public stock," and the interest thereof should be annually paid to said tribe.    By the second article there was reserved to the Indians "the right of living" upon certain tracts of these lands, but not including the tract in question, for a term of five years, "during which time no white man shall be allowed to settle on said tracts."    By a second treaty, the same year, December 20, 1837, (7 St. at Large 547,) the United States were to reserve 50 cents per acre as an indemnification for the location to be furnished for the future permanent residence of the Indians, and to constitute a fund for emigrating thereto.    This treaty was still further modified by the treaty of January 23, 1838, (7 St. at Large, 565,) by which a minimum price of $5 per acre was put upon these lands for and during the term of two years from the commencement of the sale. "Should any portion of said lands remain unsold at the expiration of this time, the minimum price shall be diminished to two dollars and a half per acre, at which price they shall be subject to entry until the whole quantity is sold: provided that, if any part of said lands remain unsold at the expiration of five years from the date of the ratification of this treaty, such lands shall fall under the provisions of the third article of this treaty."    Article 3: "To provide against a contingency of any of said lands remaining unsold, and to remove any objections to emigrating on the part of the Indians, based on such remainder, it is hereby agreed that every such section, fractional section, or other unsold remainder shall, at the expiration of five years from the ratification of this treaty, be sold for such sum as it will command: provided, that no such sale shall be made for less than 75 cents per acre."    Part of the lands were sold under this treaty; but the lands in question, and a large quantity of other lands formerly within the reserve, were not sold within the period of five years, or at any other time, by the government.    What, then, were the rights of these Indians when the act of 1856 was passed? They certainly did not possess the fee of these lands.    That had long before passed under the treaty of 1819, which had merely reserved to the Chippewas the use of these lands.    But if there be any doubt as to the proper construction of the treaty upon that point, it was removed by the treaty of 1837, which again ceded to the United States the tract in question.    Nor did the Indians still possess the right to occupy them.    Under the same treaty of 1837, this right was given to certain tracts, not including the one in question, and was limited to five years from the execution of the treaty.    This right of occupation never extended to the land in question, and, as to those to which it did extend, it expired in 1842, fourteen years before the act of 1856 was passed.    The only possible right which remained to the Indians then, was the right to call upon the United States for the net proceeds of these lands, at the minimum price stated in the treaties.    It is true that a sale, and not a gift, was contemplated; but all the Indians could receive in any event was the net proceeds of such sale.    This, however, was no restriction upon the right of the government to dispose of them in any other way, though it would be equitably bound to account for them as if they had been sold at the minimum price fixed by the treaties.

In short, the title of the Indians to these lands had been fully extinguished. We are not, then, embarrassed by the considerations which influenced the court in the case of *Railroad Co.* v. *U. S.*, 92 U. S. 733, in which it was held that a general grant of lands to a railroad would not be construed to embrace lands of which an Indian tribe had been granted by treaty the use and possession for an indefinite length of time. In this case, by a treaty negotiated in 1825, there was reserved to certain tribes a tract of land "so long as they may choose to occupy the same." In 1863, and while this treaty was still in force, congress granted certain lands to the state of Kansas to aid in the construction of certain railroads. The act contained a reservation similar in language to that contained in the act of 1856, and it was held that it did not apply to lands secured to the Indians under the treaty of 1825, notwithstanding that in 1865, two years after the grant had been made to the state, another treaty was negotiated, by which the lands were ceded absolutely to the United States, in trust to sell, and place the proceeds of sale to the credit of the Indians. The court took the ground that the perpetual right of occupancy negatived the idea that congress intended to grant the Indian lands, either absolutely or *cum onere*. "For all practical purposes, they [the Indians] owned it; as the actual right of possession—the only thing they deemed of value—was secured to them by treaty until they should elect to surrender it to the United States." Three of the judges dissented. The case, however, is distinguishable from this in the important fact that the Indians retained the right of occupancy at the time the grant was made to the state,—a right which had been declared to be as sacred as the right of the United States to the fee. *Cherokee Nation* v. *Georgia*, 5 Pet. 48; *U. S.* v. *Cook*, 19 Wall. 591. It is unnecessary to decide whether, if the land had been held by a private person in trust for the Indians, to sell and invest the proceeds, a donation of the same lands to a railroad company would be valid; because, as it seems to us, a rule of this kind ought not to be applied to the government in dealing with the public lands. It was the policy of the government at that time to make grants of alternate sections of public lands to states for the construction of railways, doubling the price of the other sections, so that the government might, by thus opening the country traversed by these railways, realize as much from the sale of one-half the lands as it would have realized from the whole of them had no such grant been made. It seems to us that the right to dispose of these lands in this way ought not to be embarrassed by the fact that they were held under a trust to account to the Indians for their value, when no doubt existed as to the ability and willingness of the government to make such accounting, or to settle with the Indians in some manner satisfactory to them. That, in fact, had already been done in this case before the act had been passed, although the bargain was not fully consummated until a few days thereafter.

2. But, even if we concede that the United States had no right to donate such lands as it held in trust to sell for the benefit of the Indians, the fact remains that the road did locate these lands under the act of

1856; that such location has for over 30 years been acquiesced in, both by the Indians and the government; and that both parties to this suit claim title under this act. Under such circumstances, we do not think that the right of the Indians is, in the language of the supreme court in *Beecher* v. *Wetherby*, 95 U. S. 517, 525, "a matter open to discussion in a controversy between third parties, neither of whom derives title from the Indians." In this case, the government had granted one section in every township to the state of Wisconsin, upon her admission to the Union, for the use of schools, but subject to the right of occupancy of certain Indians. Plaintiff contended there had been a prior reservation of the land to the use of the Menominee tribe; but it was held that "the fee was in the United States, subject to that right, and could be transferred by them whenever they chose. The grantee, it is true, would only take the naked fee, and could not disturb the occupancy of the Indians. That occupancy could only be interfered with or determined by the United States." It was held that the propriety or justice of their action towards the Indians, with respect to their lands, was a question of governmental policy only, and not one which could be put in issue between third parties, neither of whom derived title from the Indians. The real question in the case under consideration is whether a private person who makes no claim under this Indian title, but holds the land in pursuance of the same act under which the plaintiff also claims, may set up a right which has lain dormant for 30 years, and which no one having an interest therein has ever seen fit to assert. We are clear in our opinion that he cannot.

If the reservation in this case did not pass under the act of 1856, it remained the property of the United States, and the government was at liberty to treat it as its own, and to patent it to whomsoever it pleased. After the execution of that treaty of 1856, and after the last vestige of the rights of the Indians to these lands had become vested in the United States, it exercised this right by issuing the patent of May 4, 1869, to the Jackson Company. The defendant, by taking possession under the act of 1856, under which the plaintiff also claims, is estopped to show that the act did not apply to these lands. We regard the doctrine of common source of title as applicable to this case. Both parties to this suit claim title to these lands under the act of 1856, and neither is at liberty to deny that the act applied to the land in question. *Gaines* v. *New Orleans*, 6 Wall. 642, 715. As was said by the supreme court of Alabama in *Garrett* v. *Lyle*, 27 Ala. 590: "We do not deny that in equity, as well as at law, the plaintiff must recover on the strength of his own title; but, because this is the rule, it does not follow that he must show a good title against all the world. It is enough that he shows a right to recover against the defendants; and there are many cases in which he has this right, although another person must recover it from him."

### THE TITLE OF THE AMBOY COMPANY.

Assuming the act of 1856 to have operated upon the lands in question, we will now proceed to examine the respective titles of the plain-

tiffs under their deed of 1869 from the Jackson Company, and that of the defendants under their deed from the Amboy Company to Maxwell, Campbell and Van Etten of November 26, 1865. Plaintiffs' position, in this connection, is that the Amboy Company never earned but 240 sections of these lands; that all which had been earned were in November, 1861, either deeded to Henry Day, of New York, or Halmer H. Emmons, of Detroit, or were mortgaged to Chapman and Williams, trustees; that four years after that, and after it had conveyed all the lands which it had earned, or had any right or power to convey, it made a deed of the lands in question to Maxwell, Campbell and Van Etten; and that no title passed to them thereby.

Defendants' position is that the Jackson Company was the mere assignee of the Amboy Company, and took the lands subject to any conveyance it may have made; and when the patent subsequently issued to the Jackson Company it inured to the benefit of Maxwell, Campbell, and Van Etten, and their grantees. This argument is more fully stated and answered in the opinion of the supreme court of this state in the case of *Railroad Co.* v. *Davison*, 32 N. W. Rep. 732, arising out of the same state of facts, in which it was held, in substance, that neither the state nor the railroad had any right to dispose of or incumber any of the unearned lands, and no right, legal or equitable, could arise out of such disposition in violation of law. We should have accepted this decision as settling the law of this case, without misgivings as to its soundness, had our attention not been called to the opinion of the supreme court in *Railroad Co.* v. *McGee*, 115 U. S. 469, 6 Sup. Ct. Rep. 123, in which, upon a somewhat similar state of facts, it was held that there had never been any forfeiture of the grant, so far as the lands in dispute were concerned, and that the title of the purchaser stood precisely as it would if the original company had completed its road within the time fixed by the act.

There can be no doubt that, so far as the decision of the state supreme court covers the construction of the state statute, it is binding upon this court, though the supreme court of the United States might have given a different construction to a similar statute. To determine this, and also to determine how far, if at all, it conflicts with the *McGee Case*, it will be necessary to analyze it with some care, in order to learn the exact points decided. The case arose upon a bill filed by the Jackson Company to remove a mortgage given by Maxwell, the grantee of himself and his two associates, to one Davison, as a cloud upon the title of the road. The case was first reported in 32 N. W. Rep. 736. In delivering the opinion of the court, Mr. Justice CHAMPLIN held:

(1) That the language of the act of June, 1856, referring to the quantity of land which might be sold, was manifestly a limitation of the power of the state to convey.

(2) If the conveyances to Day, Chapman, and Williams and Emmons carried all the lands actually earned, and no other, no title passed to Maxwell, Campbell, and Van Etten of the lands described in the bill, and included in the deed of November 28, 1865.

(3) That the deed of the state to Maxwell of May 26, 1867, (not in

evidence in this case,) conveyed no estate, either legal or equitable, because the state could not convey lands in advance of their being earned; that the Amboy Company had no right to sell any of the land not earned, on the line of its road, included in the grant, subject to the right of forfeiture. It did not possess any such right, for the reason that no such right is conferred by the act of congress, nor is it within the spirit and intent of such act.

(4) That Maxwell and his associates had no rights, as against the Jackson Company, based upon its having completed the road, and earned the lands.

(5) That it was not necessary to decide whether there was a forfeiture of the grant declared or acted upon by the legislature or not, though he inclined to think there was not.

(6) That the right of the Amboy Company to earn the land was not transferable, but might be voluntarily surrendered, and that the effect of the assignment, by the permission of the legislature, was a surrender of its right to the state, and the legislature vested this right in the complainant.

(7) That the title of the complainant to the lands as earned, was not derived from the assignment, but from the act of the legislature conferring upon the Jackson Company the land grant, subject to the prior conditions of the grant.

Another question was decided, not necessary to be noticed here. The opinion upon the rehearing also deals with this latter question, and is also immaterial.

The court evidently placed much reliance upon the frequent declarations of the supreme court of the United States in *Schulenberg* v. *Harriman*, 21 Wall. 44; and *Farnsworth* v. *Railroad Co.*, 92 U. S. 49; and *Railroad Co.* v. *Railroad Co.*, 97 U. S. 491. The case of *Railroad Co.* v. *McGee*, 115 U. S. 469, 6 Sup. Ct. Rep. 123, is not noticed in the opinion, and does not seem to have been called to the attention of the court. In this case, congress, in 1853, passed a similar act, granting certain lands to the states of Arkansas and Missouri to aid in the building of a railroad from the Mississippi, by way of Little Rock, to the Texas boundary line. The Cairo & Fulton Railroad, of Missouri, was incorporated under the laws of the state, and in 1855 the legislature passed an act vesting in that company full and complete title to the lands granted to the state by the act of 1853, and provided that the company might sell the land in the manner provided for in the act of congress, and issue bonds. On January 3, 1859, the company sold and conveyed the lands sued for to McGee, who immediately went into possession, and continued to occupy and improve them, paying taxes and assessments thereon. The deed was duly recorded, but the land was more than 40 miles from the starting point of the road on the Mississippi, and it did not appear that when it was sold a sufficient number of miles of road had been built to authorize its sale. In February, 1866, the legislature directed the governor of the state to sell the road at auction, so far as the same was constructed or projected, with all its property, and all rights and franchises belong-

ing to it, to satisfy a lien in favor of the state. In July, 1866, congress revived and extended the grant for the term of 10 years from the passage of the act, with a provision that all the lands should be patented to the state whenever the road should be completed. After the passage of this act, the railroad property was sold and conveyed by the state to certain persons, under whom the St. Louis Railway Company, complainant, claimed title. The road was completed by the purchasers, and the lands in dispute were patented to the complainant. The court decided—

(1) That the lands granted to aid in the construction of railroads do not revert, after condition broken, until a forfeiture has been asserted by the United States, either by judicial proceedings or legislative action.

(2) That no such intention appeared in this case, but, upon the contrary, the evident purpose of congress was to waive the forfeiture, and extend the time for earning the lands under the original act.

(3) That there was no forfeiture, and that the title of the defendants stood precisely as it would if the original company had completed its road within the time fixed by the act of 1853. The purchasers at the sale made by the state in 1866 took subject to the rights of the St. Louis Company, and got no better title than they had themselves.

But the act of July 3, 1866, contained provisions for forfeiture which did not appear in the act considered by the court in the *McGee Case*. After extending the time for the completion of the road for seven years, it provided that the Amboy Company should forfeit all right to said grant, or any part thereof, if it should fail to perform any of the following conditions:

(1) To clear, grub, and grade 20 miles between Owosso and Saginaw city, so that the same should be in readiness for the ties and iron by February 1, 1867.

(2) To complete said road from Owosso to Saginaw city, so that the same should be in readiness for the running of trains by November 1, 1867.

(3) To fully complete, in like manner, 20 miles of road in each and every year after said November 1, 1867, and to fully complete the entire road by the time limited by the act.

There was a further proviso that, in case of the failure of the Amboy Company to perform any of these conditions, the legislature of the state might, at its first session after such failure, confer the grant upon some other corporation, upon such terms and conditions as it should see fit, to carry out the purposes of the act of June, 1856, and, when so conferred, such corporation should be entitled to enjoy all of the grant not then lawfully disposed of, as if the same had been originally conferred upon such corporation. "But in case the said legislature shall, in such case, fail to confer said grant, then the said lands shall revert to the United States."

The purpose of the second proviso seems to have been to authorize the legislature to declare the forfeiture imposed by the first proviso, by conferring the grant upon some other road, with the right to enjoy all that had not been lawfully disposed of. The Amboy Company did make default. It did not grade 20 miles of road between Owosso and Saginaw, or any

part of it, by February 1, 1867. Thereupon the legislature passed the act of February 7, 1867, conferring upon the Jackson Company all the rights and franchises granted by the act of 1856, and theretofore belonging to the Amboy Company. It is true that the title indicates that the object of the act was to confirm the title of the Jackson Company to the property and franchises acquired by it of the Amboy Company under the act of 1865, authorizing the Jackson Company to enter into an arrangement with the Amboy Company. This act authorized the two companies to enter into an arrangement for the location of the Jackson road upon the line of the Amboy road, from Lansing, by Owosso, to Saginaw, and provided that the Jackson Company should be entitled to the land grant, and that the right of the Amboy Company to such land, so far as the portion of its road from Owosso to Saginaw is concerned, should cease upon the filing of a copy of said agreement in the office of secretary of state. This act was in force when congress passed the act of 1866, authorizing a forfeiture of the rights of the Amboy Company upon a failure to do certain specified work; in other words, it was passed in view of what had been done by the legislature the previous year. It seems to us to follow from this legislation that congress intended to forfeit the rights of the Amboy Company by empowering the legislature to confer them upon the Jackson Company. The fact that this was an amicable proceeding, as between the two companies, as appears from their agreement of October 26, 1866, does not affect the construction to be given to the act of 1866, which seems to us to contemplate a forfeiture, to be carried into effect by the legislature.

But, even if a forfeiture were not contemplated, the supreme court of the state, in the case of *Railroad Co.* v. *Davison*, 32 N. W. Rep. 726, construed the legislation of 1865 and 1867, and the agreement of October 26, 1866, as a surrender by the Amboy Company to the state of all its rights, and the vesting or conferring of such rights upon the Jackson Company, subject to the performance of the conditions of the grant; and in this opinion, even if it be not absolutely binding upon us as a question of statutory construction, we are disposed to concur.

A different conclusion might work great hardship to the Jackson Company. Maxwell, Campbell, and Van Etten did not take possession of the land under their deed, and it remained unoccupied up to the time the Jackson Company received its conveyance from the Amboy Company. The testimony shows that it had no actual notice of the deed to Maxwell, either at the time it entered into the contract, or when the grant was conferred upon it, or at the time it received its deed; and the recording of that deed was not constructive notice, since the Amboy Company had then no legal title to convey. In its search for incumbrances upon the land, the Jackson Company was under no obligation to look for conveyances by persons who did not hold the legal title. *Trust Co.* v. *Maltby*, 8 Paige, 361; *Heffron* v. *Flanigan*, 37 Mich. 274. In this particular the case differs materially from that of McGee, who, as it appears by the report, immediately went into possession, and had ever since occupied and improved it as his own, and paid the taxes and assessments thereon.

The opinion, both of the supreme court of Missouri and that of the United States, seems to have rested largely upon this ground. If, under these circumstances, the Jackson Company is to lose the benefit of these lands, then it would follow that the Amboy Company might, with equal propriety and legality, have conveyed the whole quantity of land granted, and left none, in case of failure to construct more, to be conferred upon another company.

Upon the whole, while the facts of this case are very complicated, and the questions arising upon them are by no means free from difficulty, our opinion is that plaintiffs are entitled to judgment.