FRANK W. ELLIOTT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 32632, 42454. Promulgated September 11, 1931.

*G. E. Brammer, Esq.,* and *L. Call Dickinson, Esq.,* for the petitioner.

*B. M. Coon, Esq.,* for the respondent.

OPINION.

LANSDON: These consolidated appeals have been submitted for our determination upon a stipulation of facts which we adopt and make a

part of this decision by reference. In Docket No. 32632, the petitioner appeals from the respondent's determination of a deficiency in income tax for 1924 of $28,930.56, and in Docket No. 42454 a similar deficiency of $911.32 for 1925 is challenged.

Prior to May 10, 1924, and during all of the years involved, the petitioner was vice president and business manager of the Palmer School of Chiropractic, a corporation, located at Davenport, Iowa. At some prior time in 1924, he acquired through purchase from one D. D. Evins, an inventor, a one-half interest in a device used by practitioners of chiropractic, known as a " neurocalometer."

On the 19th day of June, 1924, the petitioner and Evins entered into an agreement in writing with the Palmer School of Chiropractic, in which they purported to give to that school the exclusive rights to manufacture, sell, lease or rent neurocalometers, for a period of ten years. Pertinent provisions of the contract we quote as follows:

The licensee hereby agrees on their part to place said NEUROCALOMETER and its method of use on the market for sale, rent or lease, to protect the patent rights and to advertise it to the best of its ability, and to manufacture instruments in sufficient quantities to supply the market, all of which it agrees and in good faith binds itself to do.

Upon failure on part of licensee to comply in good faith with these conditions, the undersigned, D. D. Evins and Frank W. Elliott, their heirs or assignees at their option, and upon six months' notice, shall have the right to cancel and declare null and void this license after which the licensee shall no longer manufacture, place on the market, lease, rent or sell NEUROCALOMETERS.

It is mutually agreed by the parties hereto that in the event of the cancellation or termination of this contract, all deferred income for rentals of such instruments in the hands of licensee at the date of such cancellation or termination shall be immediately transferred and paid to the undersigned, D. D. Evins and Frank W. Elliott, and during the life of this contract all such deferred income shall be deemed to be held in trust by licensee for the undersigned, D. D. Evins and Frank W. Elliott, to carry out the terms of the contracts between the licensee and its lessees.

And in consideration of the above and foregoing, the licensee hereby agrees to pay to D. D. Evins and Frank W. Elliott a royalty of twenty per cent (20%) of the gross amount of the sales price as received in cash, or lease price or rental charges and monthly upkeep, and that is, twenty per cent (20%) of all revenue derived in any and every way on account of this lease, upon each and every NEUROCALOMETER and NEUROCALOMETER method sold, manufactured or leased or rented, which payment shall be made upon monthly statements furnished by the licensee to the said D. D. Evins and Frank W. Elliott, their heirs or assigns, and agreed to and accepted by them as correct.

It is further agreed by the parties hereto, that, of the twenty per cent (20%) gross royalty received by D. D. Evins and Frank W. Elliott, as paid by licensee, the same percentage as determined by licensee on its books to be deferred or unearned income, shall apply as the proportion of such royalty received by licensors to be also considered as deferred or unearned income, to secure the performance by licensors of the terms of the agreement with licensee to insure the continuation of patents, payment of refunds to lessees, payment of taxes, working fees, and other expenses and establishment of factories where necessary.

During the year 1924 the Palmer School of Chiropractic manufactured a large number of neurocalometers under this agreement, the use of which it licensed to practitioners for periods of ten years, under uniform contracts which provided that said licensees should each pay to the school a rental for the full term of $1,200. Of this amount, $600 was payable at the signing of the contract, and the balance monthly in advance at the rate of $5 per month, beginning at the date of the agreement. These contracts stated that the full sum agreed upon as rental was "on basis of Ten Dollars ($10.00) per month" for the ten-year term; and, in respect to the down payment of $600, provided further that:

Said payment of Six Hundred Dollars ($600.00) being a deposit for the purpose of guaranteeing the faithful performance of the terms of this contract by said Lessee and to protect Lessor against any loss and contingencies involved in replacements, improvements, repairs, traveling expenses, and other costs in connection with examinations and inspections of the instrument, and the uses and technique employed by the Lessee according to the terms of this contract; * * *

The contracts further provided that in case the lessee failed to make any of the monthly payments or to perform all other requirements the lessor should have the right to terminate the same upon 30 days' notice, but that such termination should not entitle any lessee to repayment of any sum paid by him thereunder.

During 1924 the Palmer School of Chiropractic received $1,592,803.72 from lessees under the terms of its leasing contracts, $40,559.48 of which it reported as gross income and the balance as "unearned" income. In this year the Palmer School of Chiropractic paid to the petitioner, under its leasing contract with him, the sum of $105,930.91, of which amount the petitioner reported as taxable income to him for that year the sum of $2,597.91. In 1925 the petitioner received the sum of $26,096.47 from the Palmer School of Chiropractic as payments under this lease. For this year the petitioner reported $18,651.60 as taxable income from "earned royalties" under this lease. The respondent holds that for each of these years the petitioner should have reported, as a part of his gross income, the whole of the amounts received under his contract with the Palmer School of Chiropractic, to wit, the sum of $105,930.91 for 1924 and the full sum of $26,096.47 for 1925, and has recomputed his tax for those years upon that basis.

The petitioner contends that the respondent erred in such determination, for the reason, as alleged in his petitions, that:

The money on which the tax in controversy was computed was received by the taxpayer subject to substantial limitations and conditions within the meaning (Article 51, Reg. 65), and hence is not income.

8

We see no merit in the contention thus made. The payments involved were made to the petitioner under specific terms of a written contract, which required the lessee to pay the agreed 20 per cent of its gross receipts from rental charges. in cash to him *as received.* There were no restrictions or limitations in respect to these payments, and, had the lessee failed or refused at any time to make such payments after receipt of its rentals, clearly, the lessors could have successfully maintained an action at law for their recovery, or a suit in equity for an accounting.

In these circumstances title to these payments vested in the petitioner upon their receipt, and they constituted taxable income as and from such date. *Shepard* v. *Northwestern Life Ins. Co.*, 40 Fed. 341; *Eisner* v. *Macomber*, 252 U. S. 189; *S. W. Harris*, 2 B. T. A. 933; *Marion Stone Burt Lansill*, 17 B. T. A. 413. The petitioner's theory of so-called trust, which he argues was impressed upon these funds in favor of his lessee as soon as they came into his hands, is likewise without foundation, and the cases cited by him fall far short of supporting his theory of a trust under the conditions here. In none of the cases cited was the amount of the trust fund in doubt, but at all times was known or readily determinable by reference to the fixed percentages agreed upon in the contract. In the case at bar, whether or not any funds were ever to be " considered " as subject to the so-called trust; or, if so, how much, was left entirely to the election of the petitioner's lessee; who could, by the mere entry in its books of an amount it might determine to be " deferred or unearned income " from payments made to it under another contract, impress funds in the hands of the petitioner with a trust in its favor. When we further consider that, in this case, the benefits of the so-called trust, were entirely under the control of the beneficiary, the novelty of the situation becomes all the more marked.

The respondent correctly held that the disputed payments made to the petitioner were taxable income to him in the years received and his determination is sustained.

*Decision will be entered for the respondent.*

*G. E. Brammer, Esq.*, and *L. Call Dickinson, Esq.*, for the petitioner.

