Los Angeles & Salt Lake Railroad Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 21741. Promulgated November 11, 1929.

*Henry W. Clark, Esq.,* and *Harry J. Gerrity, Esq.,* for the petitioner.

*R. W. Wilson, Esq.,* for the respondent.

174

OPINION.

MARQUETTE: The first of the issues that we are called upon to consider in this proceeding is whether the respondent erred in disallowing as a deduction from gross income for 1920, ten-sixteenths, or $2,134.06, of the amount of $3,415 paid by the petitioner to the Association of Railway Executives. This question was before the Board in *Great Northern Railway Co.*, 8 B. T. A. 225; *Texas & Pacific Railway Co.*, 9 B. T. A. 365; and *Western Maryland Railway Co.*, 12 B. T. A. 889. Under the pleadings in those cases the burden was upon the respondent to show that the petitioners were not entitled to the deductions they had taken, and, the respondent having failed to meet the burden, our decisions were in favor of the petitioners. This is, therefore, the first proceeding in which the question is presented for determination on its merits.

It appears from the evidence that the Association of Railway Executives is an association of railroad corporations, acting through their chief executives, formed for the purpose of promoting the welfare of the railroads and of representing and acting for them in matters of common interest. These activities were supported by the member railroads through contributions or assessments, and it is the assessment paid by the petitioner in 1920 which is the subject matter of this issue.

The respondent has not disallowed as a deduction from gross income the entire amount of the assessment, but only that part thereof which was used or intended to be used by the association in the advertising and publicity campaign described in the findings of fact. He contends that the disallowance is proper under article 562 of Regulations 45, which provides, among other things, that:

Sums of money expended for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses, are not deductible from gross income.

It is clear that the purpose of the advertising and publicity campaign conducted by the association was to create a body of intelligent public opinion favorable to the railroads of the country, and to avert the enactment of legislation unfavorable or injurious to them. The campaign was made by carrying in the newspapers of the country a series of advertisements setting forth the services rendered by the railroads, the problems confronting them, and suggesting sound legislation and wise regulation.

The regulation quoted above contains no definition of the words "lobbying" and "propaganda," as they are used therein. These words are often employed to convey a sinister meaning and to suggest illegitimate activities or illegal and unethical methods. However, all activities which may properly be considered as coming within the scope of these terms are not illegal.

In *Independent Brewing Co.*, 4 B. T. A. 870, the petitioner was a member of brewery associations organized and legally conducted for the purpose of furthering the interests of its members. In 1919 the petitioner paid dues to the Western Pennsylvania Brewers Association, the Westmoreland County Association, and the United States Brewers Association. In addition, it paid to the last-named association $8,340.16 as its pro rata share of the fees of attorneys employed by the United States Brewers Association to test the constitutionality of the prohibition amendment to the Constituion. In holding that the amounts paid by the petitioner to the several brewery associations, including its share of the attorneys' fees, were deductible from its gross income, we said:

We think that the amounts paid constituted ordinary and necessary expenses. All of the brewers associations mentioned were, so far as the record indicates, performing lawful services for their members and such services were in furtherance of the members' business. It does not appear from the record that the taxpayer was under any legal obligation to make a contribution for the attorneys' fees, but it was perfectly legal for the brewers' association to test the constitutionality of the prohibition amendment and the payment by the taxpayer of its proportion of the fees was an ordinary and necessary expense of doing business.

In *George Ringler & Co.*, 10 B. T. A. 1134, the petitioner, a manufacturer of beer, contributed to the Lager Beer Board of Trade to cover the expenses of employing counsel to test the constitutionality of the prewar prohibition legislation and to carry on a campaign against assertions made by the Anti-Saloon League that the brewers were wasting food products. In that case we said:

The money paid to the Lager Beer Board of Trade was expended by it and the United States Brewers Association for the benefit of the petitioner. We are of the opinion that the expenditure was for a purpose coming within the provisions of the taxing act allowing a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business.

In *G. T. Wofford*, 15 B. T. A. 1225, the petitioner was engaged in buying and selling gasoline, oils, greases, and benzol, and in selling a motor fuel consisting of benzol and gasoline and known as Woco Pep. Because of the ingredients of Woco Pep the standard test for gasoline could not be applied to it. In 1919 or 1920 the Governor of Alabama called a special session of the Legislature, one of the purposes of such session being the enactment of legislation covering motor fuels and gasoline, with provision for an inspection

fee or charge. The petitioner knew that an inspection bill fixing standards of motor fuel for the State of Alabama, based on tests of high-grade gasoline, would prohibit the sale of Woco Pep. Realizing that if a bill of the kind proposed were adopted by the State of Alabama he would be put out of business, the petitioner employed an attorney for the purpose of forestalling, to the best of his ability, the proposed adverse legislation. The attorney drafted an inspection bill containing regulations and provisions that would permit the sale of Woco Pep in Alabama, and he appeared before the Governor and the Attorney General of Alabama in behalf of the bill drafted by him. He also appeared before the several committees of the Legislature to which the bill drafted by him was referred, and explained the bill and advocated its passage. The petitioner paid the attorney $7,750 for his services. In holding that the amount so paid was an ordinary and necessary business expense and deductible in computing net income this Board said:

A special session of the Legislature of Alabama had been called by the Governor and one of the purposes of such session was the passage of a bill covering motor fuel and gasoline, with provision for an inspection fee or charge. Petitioner knew that an inspection bill fixing the standards of motor fuel for the State of Alabama based on tests of high-grade gasoline would prohibit the sale of Woco Pep, which was the principal product of his business and, in order to keep his business alive, he employed an attorney to protect his interest in connection with the legislation. The expense was an ordinary and necessary one and the services which the attorney was employed to render were entirely legitimate. The deduction is allowed.

We are unable to perceive any vital difference between the situations in the cases cited and that which gives rise to the present inquiry. There is no difference in principle between an expenditure of money to invalidate legislation already enacted and an expenditure to avert or forestall the enactment of legislation, assuming that in each instance the means or methods employed are legitimate. Nor do we see any distinction between an undertaking by an individual or corporation to avert or defeat, by direct action, legislation unfavorable to or destructive of his or its business, as in the *Wofford* case, and a joint undertaking by a number of individuals or corporations to avert or defeat, by indirect action, legislation unfavorable to or destructive of their business. We are of opinion that the expenditure in question was for a legitimate purpose vitally connected with the welfare and for the benefit of the petitioner's business, that it was made in a legal and ethical manner, and that it was an ordinary and necessary expense of the petitioner's business within the meaning of the revenue act then in force and should be allowed as a deduction from gross income.

The other issue that we are called upon to decide relates to the amount of income, if any, that the petitioner realized upon the ma-

terial and supplies settlement made by and between it and the Director General of Railroads. The respondent has determined that the profit on the settlement was $458,219.88, which he computed in the manner and on the basis set forth in the findings of fact. It is the contention of the petitioner that in the " 1920 Inventory," which means all the material and supplies delivered by the Director General to the petitioner at the end of Federal control, there was included " Excess Material," that is, material which was in excess in physical quantity of material of like kind in the " 1917 Inventory," and for which the petitioner was required to pay at the market price prevailing at the end of Federal control; that excluding from the " 1920 Inventory " the value of the " Excess Material," which was more than $459,000, the remaining value of the " 1920 Inventory " would not exceed the book value of that part of the " 1917 Inventory " which was replaced in kind, and, that therefore, the petitioner realized no profit from the settlement. The petitioner also contends that even if the " 1920 Inventory " be considered as wholly " Replacement Material," the increased value does not constitute taxable income or profit, citing *Indiana Harbor Belt Railroad Co.*, 16 B. T. A. 279. Under the facts as disclosed by the record herein the petitioner's contention as to this issue is not well taken. The situation is entirely different from that found in *Indiana Harbor Belt Railroad Co., supra*, for in this case a cash settlement is involved which was not present in that case. Nor does the fact that the " Excess Material " is included in the " 1920 Inventory " affect the result. It is true that the " Excess Material " should be excluded from the " 1920 Inventory," but the amount of the " Excess Material " should be added to the cash settlement to reflect the " Short Material " for which the Director General accounted to the petitioner at the prices prevailing at the end of Federal control. This is obvious from the contract, which provides that the Director General shall account for " Short Material " and the petitioner pay for " Excess Material " at the prices prevailing at the end of Federal control, and that the " balance shall be adjusted in cash." Making this adjustment, the " Replacement Material," plus the value of the " Short Material," computed at prices prevailing at the end of Federal control, would still be in the total amount of $3,105,739.89.

The profit or loss from the settlement can be computed as follows: The items of " Replacement Material " and their cost or book value, should be excluded from the " 1917 Inventory," but the cost to the petitioner of the " Excess Material " should be added to the amount of the cash settlement, and the difference between the " 1917 Inventory " thus reduced and the sum of the cash settlement and " Excess Material " is profit or loss, depending upon whether the

sum of the cash settlement and the "Excess Material" is greater or less than the reduced "1917 Inventory."

The respondent has determined that the petitioner realized a profit of $458,219.88 from the settlement in question. The burden of showing the respondent is in error is upon the petitioner. It has failed to meet that burden and we have before us no evidence that would justify us in disturbing the respondent's determination. The "Replacement Material" and the "Excess Material" were not segregated and separately inventoried, and we are not informed as to whether the "Replacement Material" is included in the "1920 Inventory" at a greater or a less value than in the "1917 Inventory" or is included at the same value in both inventories. Excluding from the "1920 Inventory" the value of the "Excess Material" as suggested by the petitioner, but adding the same amount to the cash settlement, the situation, on the record before us, is that the petitioner in 1917 turned over to the Director General material and supplies having a cost or book value of $2,647,519.92 and in 1920 received from the Director General material and supplies and cash having a total cost or value of $3,105,739.80. The excess of the property and cash received at the end of Federal control over the cost or book value of the property turned over to the Director General, was $458,219.88, and to the extent that it was represented by cash it constituted income to the petitioner. *Lehigh & Hudson River Railway Co.*, 13 B. T. A. 1154. The respondent's determination as to this item is approved.

The petitioner's tax liability for 1920 will be recomputed on the basis of this opinion and the agreements as to the other issues made by counsel at the hearing.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*