NORFOLK SOUTHERN RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22243. Promulgated February 20, 1931.

W. B. *Rodman, Esq., R. Kemp Slaughter, Esq.,* and *Hugh C. Bickford, Esq.,* for the petitioner.

D. A. *Taylor, Esq.,* and *J. T. Haslam, Esq.,* for the respondent.

306

**308**

OPINION.

LANSDON: Petitioner's first assignment of error related to the taxable gain, if any, realized by it in the purchase and retirement in the taxable year of $45,000 par value of its bonds for $23,083.67 less than their face value. This amount, which the petitioner included in its gross income in its return for the year, it now seeks to have eliminated therefrom upon authority of our decision in *Independent Brewing Co. of Pittsburgh*, 4 B. T. A. 870, and other Board and Court cases cited in its brief. We do not think that our decision in the *Independent Brewing Co.* appeal, *supra*, supports the contentions of the petitioner, since the facts in that proceeding are different in many respects and no liquidation of bonds was involved. The same may be said of other cases cited by the petitioner, including that of *Bowers* v. *Kerbaugh*, 271 U. S. 170. This Board, however, in cases where the facts involved were similar, has repeatedly held that such a transaction did not result in taxable income to the taxpayer within the meaning of the taxing statutes. The rule applicable to the facts herein we therefore consider to be well settled, and we sustain this contention of the petitioner. *Houston Belt & Terminal Ry. Co.*, 6 B. T. A. 1364; *Indianapolis Street Railway Co.*, 7 B. T. A. 397; *National Sugar Mfg. Co.*, 7 B. T. A. 577; *Douglas County Light & Water Co.*, 14 B. T. A.

1052; *North American Mortgage Co.*, 18 B. T. A. 418; and *Kirby Lumber Co.*, 19 B. T. A. 1046.

Petitioner's next assignment of error relates to the respondent's disallowance of deductions claimed on account of assessments paid to the Association of Railway Executives. The parties have stipulated that the evidence and findings of fact in *Los Angeles & Salt Lake Railroad Co.*, 18 B. T. A. 168, shall be incorporated in the record of this proceeding by reference. Upon authority of our decision in that case, the determination of the respondent as to this issue is reversed.

The petitioner's third assignment of error relates to the inventory increase on account of material and supplies returned by the Director General. It is stipulated that the material and supplies returned by the Director General to the petitioner in 1920, which equaled in quantity, quality, and relative usefulness the material and supplies taken over in 1917, had a value when returned in 1920 of $97,760.94 in excess of the cost to petitioner of the property it replaced. The petitioner used all of the property so returned in 1920, and charged it out on its books at the greater value. The respondent contends that the petitioner is entitled to charge against operating expenses for the year only the inventory value at time of delivery to the Director General of an agreed quantity of like property which the property so used replaced in the settlement, and not the increased value of 1920.

The single question for determination here, as we see it, concerns only the cost to petitioner of the material and supplies which it expended in the operation of its railroad in the taxable year. This question is in no way concerned with, or affected by, the date of the petitioner's final accounting with the Director General. *Illinois Terminal Co.*, 5 B. T. A. 15; *New Orleans, Texas & Mexico Ry. Co.*, 6 B. T. A. 436; *Great Northern Ry. Co.*, 8 B. T. A. 225; *Texas & Pacific Ry. Co.*, 9 B. T. A. 365; *Lehigh & Hudson River Ry. Co.*, 13 B. T. A. 1154; *Providence Coal Mining Co.* v. *Lucas*, 39 Fed. (2d) 109. Clearly the cost to the petitioner of these returned supplies was the cost of the replaced supplies delivered to the Director General. At the time of such delivery, December 31, 1917, the petitioner invoiced its supplies to the Director General at $467,056.75, which amount it charged against him on its books, under the head of "deferred assets." This amount, then, was the cost to the petitioner of the material and supplies expended in the operation of its railroad in 1920, and the action of the respondent in so holding must be sustained. *Terminal Railroad Association*, 17 B. T. A. 1135.

The remaining assignment of error challenges the action of the respondent in disallowing the petitioner's claim for a deduction from its gross income on account of maintenance to the extent of

$464,689.37, which exactly equals the credit which was allowed for undermaintenance in the final settlement between the Director General and the petitioner. The petitioner's first contention as to this issue is that inasmuch as final settlement with the Director General was made on November 4, 1922, and as it received no payment on account of undermaintenance in the taxable year, either by cash or credit, the tax problem, if any, resulting from the adjustment of its claim therefor must relate to the year in which such settlement was made. The question presented is not whether the petitioner realized a gain or sustained a loss as a result of the Federal settlement. The issue is as to the amount to be allowed as a deduction in the year before us and this must be determined in the light of the contract on the part of the Government to reimburse the petitioner for all undermaintenance.

The standard contract under which the petitioner's property was operated by the Government contains the following:

SEC. 5. (a) During the period of Federal control the Director General shall, annually, as nearly as practicable, expend and charge to railway operating expenses, either in payments for labor and material or by payments into funds, such sums for the maintenance, repair, renewal, retirement, and depreciation of the property described in paragraph (a) of section 2 hereof as may be requisite in order that such property may be returned to the Companies at the end of Federal control in substantially as good repair and in substantially as complete equipment as it was on January 1, 1918: *Provided, however*, That the annual expenditure and charges for such purposes during the period of Federal control on such property and the fair distribution thereof over the same, or the payment into funds, of an amount equal in the aggregate (subject to the adjustments provided in paragraph (c) and to the provisions of paragraph (e) of this section) to the average annual expenditure and charges for such purposes included under the accounting rules of the Commission in railway operating expenses during the test period, less the cost of fire insurance included therein, shall be taken as a full compliance with the foregoing covenant.

(b) The Director General may expend such sums, if any, in addition to those expended and charged under paragraph (a) of this section (subject to the adjustments provided in paragraph (c) of this section) as may be requisite for the safe operation of the property described in paragraph (a) of section 2 hereof, assuming a use similar to the use during the test period and not substantially enhancing the cost of maintenance over the normal standard of maintenance of railroads of like character and business during said period; and the amount, if any, of such excess expenditures during Federal control shall be made good by the Companies as provided in paragraph (b) of section 7 hereof.

(c) In comparing the amounts expended and charged under the provisions of paragraphs (a) and (b) of this section with the amounts expended and charged during the test period, due allowance shall be made for any difference that may exist between the cost of labor and materials and between the amount of property taken over and the average for the test period, and, as to paragraph (a), for any difference in use between that of the test period and during Federal control which, in the opinion of the Commission, is sub·

stantial enough to be considered, so that the result shall be, as nearly as practicable, the same relative amount, character, and durability of physical reparation.

\* \* \* \* \* \* \*

In conformity with the above provisions the Director General, in his final settlement, allowed the petitioner a credit in the amount of $464,689.27, which represented the extent to which he had failed to satisfy the conditions of paragraph (a) of the standard contract. Both parties now regard this credit as a payment to the petitioner for the undermaintenance of its properties during the period of Federal control, and hereinafter it is so considered. In our opinion in *Terminal Railroad Association of St. Louis, supra,* we said: " It may be conceded that whatever payment or allowance was made to the petitioner for undermaintenance does not constitute income to it; it represents no more than a return to it of its original capital investment." Neither of the parties here now contends that the payment was income to the petitioner in the taxable year or at any other time. Apparently they agree that as of March 1, 1920, it was a payment for property used, destroyed, or impaired during the period of Federal operation. It follows, therefore, that no income was realized by the receipt of such payment unless the amount thereof exceeded the cost to the petitioner of the capital assets thus involuntarily converted, and, since this question is not in issue, no discussion thereof is required.

Upon repossession of its property on March 1, 1920, petitioner reassumed all the burdens of maintaining its way, structures and equipment in usable condition and for that purpose expended the amount of $2,741,737.06 within the ten months ending December 31, 1920. In its income tax return for that period it deducted such sum from its gross income. The Commissioner disallowed this deduction in the amount of $464,689.37. The basis for this disallowance is the respondent's determination that to that extent maintenance for the period in question was paid for by the Government out of cash or credit allowed to the petitioner in the final settlement. No part of the credit allowed was required to be earmarked or segregated for use in replacing undermaintenance sustained during the period of Federal control. No suspense account was opened for that purpose. As of March 1, 1920, the payment in question was merged into the capital of the petitioner and, thereafter, and without limitation, was available to it for any proper corporate use.

There is no question that the entire $2,741,736.07 was expended in the taxable period for purposes regarded by the petitioner as current maintenance of way, structures and equipment. Such payments are chargeable to expense and deductible from gross income for Federal tax purposes unless they include amounts used for capital replace-

ments, for betterments, or for other purposes not included within statutory deductions from gross income. The basis for the disallowance, then, is the theory that the cost of restoring capital property for which petitioner has been previously reimbursed is not deductible as maintenance. The controversy, therefore, is one of fact only. The Commissioner has asserted a deficiency based upon the disallowance of a certain amount charged to expense as maintenance and deducted from income in the taxable year. Regardless of the basis of his determination, he has the benefit of the presumption that the amount of the deficiency is correct and it is the petitioner's burden to overcome that presumption by evidence. It must prove that the expenditures in question included nothing for capital additions or for the replacement of destroyed capital property for which it had been previously reimbursed.

The record indicates that when properly equated with reference to the decreased purchasing power of the dollar resulting from very substantial increases in the costs of labor and material in 1920, the amount expended for maintenance in the taxable period was below the average of similar expenditures for any corresponding terms of the test period. It is stipulated that the average annual cost of maintenance in the test period was $1,272,388.90, which indicates an average for any ten months therein of $1,060,324. Application of the equating factor to this amount gives $2,746,239, which is so near the amount charged by the taxpayer in the taxable period in 1920 dollars that the difference may be ignored. Since this result is reached by exactly the same method which the standard contract provides for the computation or determination of under or over-maintenance, it seems to us that it conclusively establishes the contention of the petitioner.

Respondent objects to the soundness of the equating method unless it can be shown that the properties were equally used in the several periods. The petitioner's property was a railroad in active operation during the test period, the period of Government operation and the taxable year. In the light of all the facts of record and of the historic events within the field of common knowledge, we may safely assume that any difference in use between the test period and the taxable year was of such a nature as to increase the amounts required for maintenance in that period.

The conclusion which we have reached by what may be called the comparative or accounting method is well supported by the evidence adduced as to the actual physical condition of the petitioner's properties at the beginning and end of the taxable period. Responsible officers of the petitioner testified that way, structures and equipment were in a worse condition at December 31, 1920, than at

March 1, of that year. This testimony is supported by documentary evidence of record as exhibits which show facts as to equipment in considerable detail. All agreed that undermaintenance accelerated substantially during the period in question. While this evidence standing alone may not be conclusive, it is certainly very persuasive and is strongly corroborative of the results reached by a comparison of accounts.

That some small portions of the payments for maintenance during the taxable period may have reduced some item of physical undermaintenance that existed at the beginning thereof is not material. The credit in question was not allowed as payment for actual physical loss resulting from using up or destroying definitely identified and inventoried assets of the petitioner, but was an amount ascertained by comparing the costs of maintenance during the period of Federal control with the payments for such purpose during the test period. It is an accounting result representing impairment or destruction of a mass of capital property which is presumed to have occurred because as compared with the test period an insufficient amount was paid for maintenance. To ask the petitioner to show that no item of its tangible property that was in disrepair at March 1, 1920, was rehabilitated during the ten-month period under review is, in the circumstances here, to impose an impossible condition. The evidence shows that the total expended is a proper deduction from petitioner's gross income for the taxable period as a part of the ordinary and necessary expenses of the petitioner.

The respondent also argues that it is only natural for a railroad first to make the repairs that are essential to its safe and profitable operations and he seems to assume that the undermaintenance existing at March 1, 1920, was all of that nature. Here he again ignores the fact that the credit was not allowed for the purpose of restoring deteriorated, impaired, or destroyed assets definitely determined by count, weight, measure, and value. Even if the undermaintained assets, if any, could be identified, there is no reason to believe that their immediate replacement was essential to the operation of the property. The Government was using this railroad at the date of its return to its owners. If there is any presumption as to its condition, then it is that the Director General had kept it in good condition and that the deferred repairs, if any, were not essential to continued and successful operation. The undermaintenance determined solely by a comparison of expenditures may have resulted largely from failure to paint structures and cars, to keep weeds out of the right of way, or on account of any one of many other conditions not essential to the safe and profitable operation of the property. When the petitioner reassumed the burden of maintenance and was with-

314

out adequate funds for the complete rehabilitation of its railroad, it is certain that it must have made such ordinary repairs as were necessary to operation, but there is no reason to presume that any part of the money so expended restored all or any substantial part of the undermaintenance at March 1, 1920, which was determined by a mere accounting method. On this issue the determination of the respondent is overruled.

Reviewed by the Board.

*Decision will be entered under Rule 50.*