THE KANSAS CITY SOUTHERN RAILWAY COMPANY AND AFFILIATED COMPANIES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 22608, 35527–35531. Promulgated March 30, 1931.

*S. W. Moore, Esq.*, and *Fred R. Angevine, Esq.*, for the petitioner.
*Montgomery B. Angell, Esq.*, as *amicus curiae.*
*P. M. Clark, Esq.*, and *H. B. Linton, Esq.*, for the respondent.

OPINION.

LANSDON: The proceedings at the several docket numbers herein have been instituted by the Kansas City Southern Railway Company and its affiliated corporations. By agreement of the parties all have been consolidated for hearing and decision. For convenience the several appellants will be referred to hereinafter as the petitioner. The respondent has asserted deficiencies in income and profits taxes for the years 1920, 1922, 1923, 1924, and 1925 in the respective amounts of $344,515.39, $50,683, $312,006.01, $19,924.93, and $27,368.90, and has determined an overassessment for the year 1921 in the amount of $18,556.64.

At the hearings of these proceedings on May 19, 1929, and March 6, 1930, the parties filed three sets of stipulations, which the Board receives and incorporates in this report by reference. Documentary and oral evidence adduced at the hearing for the most part related to the facts agreed to in the stipulations and contained no basis for other findings of fact. Originally the petitioner pleaded 23 errors, to which two additions were made at the hearing. The respondent has amended his answer by one affirmative allegation. The issues will be stated, discussed and decided substantially in the order in which they were pleaded by the petitioner.

(1) and (13) In the years 1920, 1922, 1923, 1924, and 1925 the petitioner received donations for use in construction on its right of way, of spur tracks and other facilities for the use of shippers in the respective amounts of $7,940.52, $50,778.47, $24,072.41, $12,722.79, $6,971.80, and $11,797.21. These amounts were not reported as income in the petitioner's income tax returns for the several years involved. In his audit of such returns the respondent added the several amounts to petitioner's income as reported for each of the respective years. The same question was at issue in *Kansas City Southern Ry. Co. et al.*, 16 B. T. A. 665, and the respondent there confessed error. We have previously held in *Great Northern Railway Co.*, 8 B. T. A. 225, that amounts so received by a railroad company should not be included in taxable income. The determination of the respondent on this issue is reversed.

(2) The respondent originally proposed to include in petitioner's income for 1920, the amount of $1,075,808.05 alleged to have been paid to it by the Government in that year in conformity with the guaranty provision of the Transportation Act of 1920. He now confesses error to the extent of $113,355.03 and proposes to include such payment in the petitioner's income for the taxable year only in the amount of $962,453.02. None of the facts are in controversy. The petitioner contends that the payment was in the nature of a subsidy or gift and that there is no legal basis for its inclusion in taxable income in 1920, or in any other year. In support of its contention it relies on the decision of the Supreme Court in *Edwards* v. *Cuba R. R. Co.*, 268 U. S. 628; *Kerbaugh-Empire Co.*, 271 U. S. 170; *United States* v. *Hurst*, 2 Fed. (2d) 73; *Liberty Light & Power Co.*, 4 B. T. A. 155; *Great Northern Railway Co.*, 8 B. T. A. 225; *Rio Electric Light Co.*, 9 B. T. A. 1332; *Atlantic Coast Line R. R. Co.*, 9 B. T. A. 1193; *Texas & Pacific R. R. Co.*, 9 B. T. A. 365; *Tampa Electric Co.*, 12 B. T. A. 1002; *R. Hoe & Co.* v. *Commissioner*, 30 Fed. (2d) 630.

In our opinion all the cases cited contain facts which distinguish them from this proceeding. *Edwards* v. *Cuba R. R. Co.*, *supra*, is not in point. There the Government paid a subsidy to a railroad company which the Supreme Court held should not be included in taxable income. The purpose of the payments was to secure additional railway facilities for the use of the public and the Government. With such objectives in view the Government proposed, in certain conditions, to provide a part of the capital required for construction. Payments were made to the company, mile by mile, while work on the road was in progress. It is a fair inference that the subsidy could only be used to replace funds already expended for capital purposes, since the Act provided for payments only as sections of the road were completed. The same principle governs grants of lands, funds, and/or credits voted by Congress for aid in constructing railways in this country. Always a condition to the receipt of subsidy was that some specified construction work had been done or would be done in the future. *Burke* v. *Southern Pacific R. R. Co.*, 234 U. S. 669; *Fullinwider* v. *Southern Pacific R. R. Co.*, 248 U. S. 409; *Shepard* v. *N. W. Life Insurance Co.*, 40 Fed. 341. Such subsidies were voted for capital purposes and use therefor was required. No such conditions exist here. The petitioner received the guaranty payment free from limitations or restrictions and from the date of such receipt it was available for all corporate purposes to which income may be applied. It could be used for the payment of dividends or operating expense, or it could be invested in capital additions.

This is in sharp contrast with the single use which could be made of the subsidy in the *Cuba* case, which we think is in no wise controlling in the circumstances herein. Most of the other cases cited deal with direct gifts or with gifts that effected a reduction of losses already sustained or anticipated in the near future. In view of the conclusion reached hereinafter as to the nature of the guaranty payment in question, such cases have no application here.

The transaction here involved is not as simple as the petitioner contends. The condition of American railroads at the end of Federal control was matter of common knowledge. The Director General had operated all such properties for the single purpose of assisting the Republic in the war it was waging against its allied enemies. He merged all the railway lines under his control into a single nationwide system. Tonnage, whether publicly or privately owned, was routed solely in the interest of the Government. Freight and passenger equipment was pooled, and, regardless of ownership, was used wherever and however demanded by military exigencies. As petitioner argues, it was everywhere recognized that such a revolutionary employment of railway facilities would seriously impair the value of their services to patrons and their earning power for their stockholders when returned to their owners. This does not mean, however, that the Government, through the guaranty provisions, recognized any moral obligation to supply adequate transportation facilities to its citizens and appropriated and donated the revenues of the treasury to enable the roads more efficiently to serve the private interests of the country. If such an obligation existed, it would seem to have been fully recognized and adequately discharged in those provisions of the Transportation Act which authorized loans to the carriers and extensions by funding and refunding of debts which the roads then owed to the Government.

We are not persuaded that the guaranty provision was in recognition of any obligation or responsibility to the public. On the other hand, all the facts indicate that it evidenced the acceptance, probably after considerable pressure, of an obligation to the carriers which was definite in character, but, at the time, unknown as to amount. The standard contract under which most of the roads were operated and the obligations to all were settled, provides, in effect, that at the termination of Federal control the several properties should be returned to their owners in as good condition as when they were taken over by the Government. This was accomplished for the mere physical assets by payments or credits on account of undermaintenance, but if after such adjustment the earning powers of the roads and their credit as a basis for borrowings to rehabilitate their properties, due to conditions resulting from operation by the

Director General, were substantially impaired, the Government, to the extent of such impairment, was still short of a complete discharge of its obligations. The condition of the roads, other than physical, at March 1, 1920, made it impossible for them either adequately to serve their patrons or to earn any profits for themselves. It was generally known that railroad necessities indicated substantial increases in freight and passenger rates and the borrowing of large sums of money. Since these things could not be done without the approval of the Interstate Commerce Commission and the restoration of credit, a long time would be required and the roads were in a condition so desperate that any delay was costly and hazardous to the interests of the owners. This subnormal state, resulting from the Government's use of the properties for war purposes, could not be computed in dollars but it was recognized by the Government and responsibility therefor accepted. Whether the restoration of the prewar earning capacity of the railroads that had been under Government control was a legal obligation enforceable at law under the terms of the " standard contract " has never been decided by the courts because, in the postwar railway crisis, the Congress promptly conceded the responsibility of the Republic and settled a recognized obligation without requiring the carriers to resort to litigation.

In the circumstances disclosed by the record and in the light of historical events within common knowledge, we conclude that the payment in question was in recognition of an obligation assumed by the Government when it temporarily sequestered the petitioner's railroad for war purposes. It remains only to determine whether such payment was income, within the meaning of the Constitution, and, if so, whether it was taxable to the petitioner in the year in which it was received. Formal acceptance by the petitioner of the proffer of the Government and actual use of its property in railway operations were, by law, made conditions precedent to the receipt of any guaranty payments. We believe that such proffer and acceptance effected a contract binding on the Government to pay and on the petitioner to use its capital in order to realize income equal to that which it had enjoyed, in the test and Federal control periods. In these conditions we are of the opinion that the guaranty payments, in the total amount of $962,453.02 were elements of the petitioner's operating receipts in 1920, resulting from the use of its capital in that year and, therefore, within the standard definition of taxable income. *Connecticut General Life Insurance Co.* v. *Eaton*, 218 Fed. 188; *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179; *Stratton's Independence* v. *Howbert*, 231 U. S. 399; *Eisner* v. *Macomber*, 252 U. S. 189; *Trefray* v. *Putnam*, 227 Mass. 522; *Thompson* v. *Commis-*

*sioner of Internal Revenue*, 28 Fed. (2d) 247; *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233.

(3) and (15) The petitioner alleges that the respondent has erroneously increased its taxable income for the year 1920 in holding that Federal compensation as for that year was received by it in the amount of $536,858.64. In *Kansas City Southern Railway Co. et al.*, *supra*, we found that the total compensation received by the petitioner for the use of its property by the Government was $8,222,-950.82, which is equivalent to $3,800,000 annually. In the instant proceeding it is stipulated that if the Board decides that the petitioner's annual income from Federal compensation was $3,800,000, then the amount of such income which the respondent theretofore had allocated to 1920 should be increased by the amount of $86,-092.18. Accordingly, we find that petitioner's income from Federal compensation in 1920 was $622,950.82.

In the proceeding at Docket No. 35527, the petitioner alleges that the respondent erroneously increased its income for the year 1923 by including Federal compensation therein in the amount of $1,136,-416.90, thereby increasing its taxable net income in the amount of $273,016.88. It is stipulated that if it is finally determined by the Board or any court of competent jurisdiction, by stipulation of the parties or otherwise, that the petitioner's income from Federal compensation in 1918, 1919, and 1920 is $8,222,950.82 and not $7,086,-533.92, then, and in that event, the taxable income for the year 1923 as adopted by the respondent shall be reduced in the amount of $1,136,416.90. In the proceeding at Docket No. 12054 (16 B. T. A. 665), we determined that the petitioner's total income from Federal compensation, in the years 1918, 1919, and 1920, was $8,222,950.82, allowable ratably over the entire period of Federal control. See *Illinois Terminal Co.*, 5 B. T. A. 15; *Cincinnati, Findlay & Fort Wayne Ry. Co.*, 5 B. T. A. 108; *Virginia Carolina Securities Corporation*, 6 B. T. A. 84; *New Orleans, Texas & Mexico Ry. Co.*, 6 B. T. A. 436; *Texas & Pacific Railway Co.*, 9 B. T. A. 365; *Old Dominion Steamship Co.*, 16 B. T. A. 264; 47 Fed. (2d) 128. Accordingly, we find, in conformity with the stipulation, that the petitioner's taxable income for 1923 as adjusted by the respondent should be reduced in the amount of $1,136,416.90.

(4) and (12) The petitioner alleges that the respondent erred in disallowing a deduction for depreciation or obsolescence in connection with the abandonment of certain segments of the petitioner's railroad. This identical question was before the Board in *Kansas City Southern Ry. Co. et al.*, *supra*. We there held that inasmuch as the deduction claimed was depreciation or obsolescence resulting from the abandonment of property prior to the taxable year, there is no legal basis for its allowance as claimed herein. See also *First*

*National Bank of Evanston, Wyo.*, 1 B. T. A. 9; *Winter Garden, Inc.*, 10 B. T. A. 71; *Dilling Cotton Mills*, 2 B. T. A. 127. The respondent's determination is sustained.

(5) The petitioner alleges that the respondent erroneously reduced the deduction claimed by it for ordinary and necessary expenses for the year 1920. On December 31, 1917, it turned over to the Director General an inventory of materials and supplies carried on its books at a value of $1,170,102.92. On March 1, 1920, the Director General turned back to the petitioners a corresponding inventory equal in quantity, quality and relative usefulness, carried on the books at values in excess of the inventory received in 1917, in the amount of $351,600.18. The inventory so received was all used by the petitioners in 1920 and charged out to expenses and betterments at its March 1, 1920, value. Upon audit the Commissioner held that the cost of such materials and supplies so used was the book value of the inventory turned over to the Director General at December 31, 1917, and disallowed deductions claimed as ordinary and necessary expense to the extent of $351,600.18. The parties have stipulated that of such disallowance, $100,631.43 represents the excess value of such materials charged out as additions and betterments. It follows, therefore, that only the amount of $250,968.75 is in controversy as a factor of the petitioner's operating expenses in 1920. This question was before the Board in *Terminal Railroad Association of St. Louis*, 17 B. T. A. 1135; *Missouri Pacific Railroad Company*, 22 B. T. A. 267, and *Norfolk Southern Railroad Company*, 22 B. T. A. 302. In each of such proceedings, we held that the cost of materials and supplies in question was the book value at December 31, 1917, of the corresponding inventory turned over to the Director General. On the authority of such decisions the determination of the respondent is sustained in the amount of $250,968.75.

(6) In the final settlement "between the Director General and the petitioner the amount of $809,773.83 was allowed and credited to the petitioner on account of undermaintenance of way and structures." No amount on account of undermaintenance of equipment was allowed or credited. In the ten-month period from March 1, 1920, to December 31, 1920, the petitioner paid on account of maintenance of way and structures and of equipment the respective amounts of $2,553,786.12 and $3,494,811.24, or a total of $6,030,597.36, all of which was charged to expense on its books of account and deducted from its gross income in its income and profits-tax return for 1920 as ordinary and necessary expenses incurred in such year. Upon audit of petitioner's income and profits tax return for such year the respondent disallowed the deductions so claimed to the extent of $809,773.83, holding that in that amount the Government had reimbursed the petitioner by its allowance for undermaintenance of way and struc-

tures sustained during and deferred from the period of Federal control. The petitioner challenges this reduction and contends that the entire amount of $6,030,597.36 was expended for maintenance and that in conformity with requirements of the Interstate Commerce Commission it must charge all maintenance to operating expenses for the years in which payments on account thereof are made.

Apparently it is the contention of the respondent that the amount paid the petitioner for undermaintenance of way and structures was earmarked and impressed with a trust for use in replacing undermaintenance that existed at the end of Federal control. We have held in *Terminal Railroad Association of St. Louis, supra,* and in *Norfolk Southern Railroad Co.,* 22 B. T. A. 302, that payments made by the Director General to railroads on account of undermaintenance are of a capital nature. We think it follows that after any such payment the amount thereof merged into the resources of the railroad and became available to it for any proper corporate purpose. If this position is sound there is no relation between the payment by the Director General for undermaintenance and the deductions which this petitioner is legally entitled to take from its gross income as operating expenses in the computation of its tax liability in 1920, unless the cost of replacement of capital property previously or in the future to be paid for is included in the amount claimed. The deductions from gross income on account of maintenance must stand or fall on proof as to whether they are within the statutory enumeration of items deductible from gross income in the computation of net taxable income.

The applicable statutory provision is section 234 (a) (1) of the Revenue Act of 1918, which, so far as pertinent, is as follows:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

Petitioner's contention under this provision can be maintained only by proof that the amount claimed is ordinary and necessary expenses of the year 1920, paid or incurred in that year.

This question was before the Supreme Court in *Grant* v. *Hartford & New Haven R. R. Co.,* 93 U. S. 225, in a controversy between a railroad and the Collector of Internal Revenue over the railroad's right to charge to current expenses the cost of a new stone bridge erected to replace an obsolete wooden structure. The Collector contended that the bridge was an added improvement of a permanent character and assessed its entire cost without reference to the value of the old bridge it replaced. In sustaining a verdict rendered by the

lower court, in favor of the railroad, the Court, among other things, said:

\* \* \* The object of the law was to impose a tax on net income, or profits, only; and that cannot be regarded as net income, or profits, which is required and expended to keep the property up in its usual condition for operation. Such expenditure is properly classed with repairs, which are a part of the current expenses. \* \* \*

The counsel for the government insists that this bridge was a betterment, because it was much more valuable than the old wooden bridge. But the assessor did not include the excess merely; he assessed the whole expenditure bestowed upon the new bridge, without making any allowance for the old one. \* \* \* In this view he was decidedly wrong. Earnings expended on a new structure may or may not be profits, whether they are or not depends on other things to be taken into the account besides the mere fact of such expenditures. Had the assessment been merely for the increased value of the new bridge over the old one when in good repair, the case might have admitted of very different consideration.

It remains then only for us to determine how much, if any, of the petitioner's payments for maintenance in 1920 represents replacement of capital assets undermaintained in prior years. The parties stipulate that by using the test period as a basis they have determined that for the ten months in question here the petitioner's way and structures were undermaintained to the extent of $216,295.54 and that its equipment was overmaintained to the extent of $646,117.43. If these two amounts are merged overmaintenance of the petitioner's railroad for the taxable year is indicated in the amount of $429,-821.89, and it is our opinion that such amount should not be included in the petitioner's deduction for ordinary and necessary expenses in 1920, as it was used for the replacement of property destroyed during the period of Federal control for which the Government was under obligation to reimburse the petitioner and for which the petitioner was later reimbursed by the allowance for undermaintenance. The respondent's disallowance in the amount of $809,773.83 must be approved in the amount of $429,821.89 and disapproved in the amount of $379,951.94. The proper adjustments will be made under Rule 50.

(7) The parties stipulated that for many years the established accounting practice of the petitioner has been to accrue and report its monthly operating income on an estimated basis. If there is more or less income it is carried to a suspense account until the following month, when an adjustment is made. During the month of December, 1920, it underestimated its revenues in the amount of $282,555.66, which was not reported as income in 1920. Estimates of income are made up each week from the reports of agents and conductors and about three days after the close of the month are assembled and the result is accrued as the revenue of the month. This method may re-

sult in either under or overaccruals of revenue and whichever occurs is adjusted in the following months, but actual revenues can not be determined for a considerable time after the books are closed for any given month. The question here is whether the amount of actual or estimated and accrued revenue for December, 1920, shall be included in the petitioner's taxable income for that year.

The Revenue Act of 1918 provides as follows:

SEC. 212. (b) The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal or calendar year as the case may be) in accordance with the basis of accounting regularly employed in keeping the books of such taxpayer; but * * * if the one method employed does not reflect income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income * * *.

In his Regulations 45, article 22, relating to the administration of the above section, the Commissioner says:

* * * The time as to which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such manner as clearly reflects the taxpayer's income. If this method of accounting regularly employed by him in keeping his books clearly reflects his income, it is to be followed with respect to the time as of which items of gross income and deductions are to be accounted for. * * * If the taxpayer does not regularly employ a method of accounting which clearly reflects his income, the computation shall be made in such manner as in the opinion of the Commissioner clearly reflects it.

In the Revenue Act of 1921, Congress reenacted section 212 of the Act of 1918 without change. The Commissioner likewise incorporated article 22 of Regulations 45 in his Regulations 62, but also promulgated a new principle in his new article 111 which, so far as pertinent here, is as follows:

* * * It is recognized, however, that particularly in a going business of any magnitude there are certain overlapping items both of income and deduction, and so long as these overlapping items do not materially distort the income they may be included in the year in which the taxpayer, pursuant to a consistent policy, takes them into his accounts. * * *

The petitioner contends that the nature of its business is such that actual income for any taxable year can not be ascertained before the date at which its income tax return must be filed; that the method of estimates is a part of its long established system of accounting which it has consistently practiced; and that the resulting distortion of income is so slight that the respondent is not justified in requiring it to change a system of accounting now practiced with the approval of the Interstate Commerce Commission. The force of the petitioner's argument on this issue is greatly weakened by the facts of record here. The law requires a tax return for any given year not later than March 15 of the succeeding year. It would seem that two and one-half months is sufficient time for the collection of the petitioner's share

of passenger and freight receipts resulting from traffic originating on other lines and for its settlement for such receipts collected by its agents for service rendered by other lines. Even if such settlements are not completed before the due date of the return for any given year, it is always possible to file a tentative return and request an extension of time. And this, in fact, appears to have been the proceeding of the petitioner in the taxable year in which its final amended return was not filed until September 2, 1922. Certainly at that date, nearly two years after the close of the taxable year, it would have been possible to report the actual revenues of the year 1920. We are of the opinion that the circumstances here do not bring the petitioner within the exceptions in the Commissioner's regulations which deal with overlapping income items. On this issue the determination of the respondent is approved.

(8) The petitioner alleges that the Commissioner erred in not making the adjustments to invested capital which would follow the adjustments of income for which it contends. No evidence was adduced on this issue, which the petitioner abandons except as to 1920. For that year it contends that adjustments should be made with respect to income and excess profits taxes and other adjustments for the years 1918 and 1919 resulting from our decision in *Kansas City Southern Ry. Co. et al., supra.* In our opinion such adjustments should be made in the settlement of tax liability for 1920 under Rule 50.

(9) The petitioner alleges that the respondent erred in failing to allow a deduction from gross income in 1920 in the amount of $900,254.17, on account of undermaintenance sustained during the period of Federal control. In November, 1923, the Director General and the petitioner agreed to a final settlement of all the claims and counter claims growing out of Federal control. Payment in the lump sum of $1,500,000 was made to the petitioner. This was a balance or difference between the adverse claims of the two parties to the settlement. We have held that in such a lump-sum settlement any item on either side of the account must be regarded as paid in full. *Lehigh & Hudson River Ry. Co.*, 13 B. T. A. 1154. It appears therefore that petitioner's claim for the undermaintenance of its property was fully liquidated in the final settlement. Even if we are wrong in this conclusion, the controversy is one of fact and the claim of the petitioner can only be established by a preponderance of evidence.

There is no proof in the record that any identifiable physical assets were undermaintained during the period of Federal control. The counter claims for undermaintenance and overmaintenance of equipment so nearly balanced that they were eliminated from the final settlement. The amount of $809,773.83 appears in such settlement

as an allowance to the petitioner for undermaintenance of way and structures. If this amount was in excess of the cost of. that mass of equipment destroyed by Federal control, the petitioner realized a gain. If it was less than such cost, a claim for a loss might lie upon proof of the necessary facts. There is no proof in support of the petitioner's contention.

(10), (11) and (16) Three questions relating to interest due to or from the petitioner are presented by the pleadings: (1) Whether interest due from the Director General in 1920 in the stipulated amount of $365,443.32 is exempt income as interest on obligations of the Government; (2) whether interest due by the petitioner to the Government in the same year shall be deducted from its income for such year as ordinary and necessary expense; and (3) whether the respondent erred in increasing petitioner's income for the year 1923 in the amount of $128,676.17 representing the full amount of interest rental on additions and betterments allowed in the final settlement in such year. These questions were at issue in *Kansas City Southern Ry. Co. et al., supra.* It was there decided that the interest due the petitioner for the years 1918 and 1919 was taxable income and not exempt as interest on Federal obligations and that it should be included in the computation of gross income in the years in which it accrued. It was also decided therein that the interest due the Government for the years 1918 and 1919 should be deducted from petitioner's gross income in such years. It is herein stipulated that in the determination of taxable income of the petitioner for 1920 the respondent added the amount of $4,265.39 thereto, which is the difference between the amounts due by and to the petitioner in the taxable year. Interest due the petitioner in the taxable year was not exempt income; interest due by the petitioner in such year is an allowable deduction. These items were properly offset in the petitioner's computation of net income and the amount of $4,265.39 was properly included therein. *Kansas City Southern Ry. Co. et al., supra; Texas & Pacific Railway Co.*, 9 B. T. A. 365.

It is also stipulated that if it is decided in Dockets Nos. 12054 and 22668 that interest accrued and/or received by the petitioner from the Director General in final settlement on account of additions and betterments completed during the period of Federal control constitutes taxable income accrued or earned during such period, the petitioner's taxable income for 1923, as adjusted by the respondent, shall be decreased in the amount of $128,676.17. This adjustment will be made under Rule 50.

(14) The petitioner contends that it is entitled to deduct the amount of $360,730.59 from its gross income in 1920, representing the

cost of ballasting and reballasting its tracks in the period from June 30, 1914, to June 30, 1917, and originally charged to property account. Some years later the Interstate Commerce Commission held that it should have been charged to expense. After a long, drawn-out controversy the petitioner was ordered to take the amount in question out of its capital account and charge it to operating expenses spread in equal amounts over the months of October, November, and December, 1923. This was done and the amount thereof was deducted from petitioner's gross income in its income tax return for 1923. Upon audit the Commissioner disallowed such deduction and added the amount to taxable income for 1923. The petitioner does not contend that the amount here involved represented ordinary and necessary expenses for 1923, but argues (1) that it is now impossible to allocate the amount to the years in which the expenses were incurred and paid, and (2) that it had no choice except to obey the order of the Interstate Commerce Commission.

We are not impressed with either argument. Obviously the amount in question was not incurred or paid as operating expense in 1923, and it can not be allowed as a deduction for that year under the provisions of section 214 (a) (1) of the Revenue Act of 1921. *J. Noble Hayes*, 7 B. T. A. 936. The orders of the Interstate Commerce Commission as to accounting are doubtless binding on the petitioner. *Kansas City Southern Ry. Co.* v. *United States*, 231 U. S. 423. But the jurisdiction of that body is quite without the field of taxation. Among other things the basis for its authority over railway accounts rests on its duty to pass on rates for services rendered by the carriers and to prevent discrimination and favoritism. Cf. *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194. It is well established that transportation rates must compensate the owners for the use of their capital. The Interstate Commerce Commission is charged with the oversight of accounting for the purpose of determining capital investments in railway properties as a basis for rate making.

Since 1921 the taxing authorities have had no concern with the capital investments of corporations as a basis for tax liability. The Commissioner of Internal Revenue is charged with the single duty of determining and collecting taxes on annual income. He must enforce the statutes designed to prevent distortion of income and effect the imposition of Federal taxes on the basis contemplated by law. It is quite unlikely that the Interstate Commerce Commission would take judicial notice of any finding of the Commissioner or of this Board as to the invested capital of any railroad as the basis for compensatory service rates. On the other hand, there is no reason why the taxing authorities should be bound in income tax

determinations by any Interstate Commerce regulations or rules relating to the capital of carriers. Each, in its own domain, must discharge its duties as prescribed by the statutes. On this issue the determination of the respondent is approved.

(17) During the period of Federal control the petitioner acquired certain equipment and accrued depreciation thereon at the rate of 4½ per cent per annum. In the final settlement in November, 1923, the Director General allowed such depreciation at the rate of 4 per cent, which resulted in a difference of $9,531.03 between amounts charged off and amounts allowed. In 1923, for the purpose of adjusting its books, the petitioner charged such amount to profit and loss and claimed deduction from its gross income on account thereof as a loss sustained in the taxable year. Upon audit the respondent added $9,531.03 to petitioner's gross income for 1923. We think the respondent must be sustained on this issue. The deduction claimed represents either a loss or a charge-off of depreciation. In either event the amount, if allowable upon any basis, related to income in the period of Federal control. A loss must be charged against income in the year it was sustained. Likewise depreciation is a charge against income in the year in which the wasting assets were used and can not be accrued and deducted in later years.

(18) The petitioner alleges that the respondent erroneously disallowed as a deduction from its gross income in 1923, the amount of $1,048.35 which it charged off as a loss in that year. This issue was abandoned at the hearing and, accordingly, the determination of the respondent in respect thereof is approved.

(19) The petitioner alleges that the respondent erred in holding that a certain inventory adjustment in the amount of $71,276.90 is not deductible from its gross income in the year 1922. The facts are stipulated and the parties now agree that petitioner's taxable income for 1922 should be increased only in the gross amount of $63,462.02 instead of $71,276.90, as originally determined by the respondent. The decrease in taxable income resulting from the stipulation should be included in the recomputation of petitioner's taxable income for 1922 under Rule 50.

(20) In the years 1922, 1923, 1924, and 1925, the petitioner contributed amounts that are stipulated in the record to railroad Y. M. C. A.'s; annual firemen's and policemen's balls at Kansas City; Priests of Pallas; Third Regiment National Guard of Missouri; and the Association of Railway Executives, and deducted such contributions from its gross income reported in each of the several years as ordinary and necessary expenses. Upon audit of petitioner's return for the respective years the Commissioner disallowed all such deductions. The amounts in controversy are stipulated. On similar

facts we held in *Kansas City Southern Ry. Co. et al., supra,* that contributions to railroad Y. M. C. A.'s were deductible from petitioner's gross income in the years 1918 and 1919. That decision controls here. See *Indiana Harbor Belt Railroad,* 16 B. T. A. 279; *Terminal Railroad Association of St. Louis, supra.* There is no legal basis or controlling precedent for allowing contributions to firemen's and policemen's balls or a regimental armory. The evidence discloses no direct benefit to the petitioner resulting therefrom. Such contribution may not be deducted from gross income as ordinary and necessary expenses. The contribution to "Priests of Pallas" should be included in ordinary and necessary expenses, since its direct purpose was to increase petitioner's income from passenger fares. *Ranier Grand Co.,* 11 B. T. A. 520. See also *Poinsett Mills,* 1 B. T. A. 6; *Holt-Granite Mills Co.,* 1 B. T. A. 1246; *Superior Pocahontas Coal Co.,* 7 B. T. A. 380. The contributions to the Association of Railway Executives was an ordinary and necessary expense and deductible from gross income in 1923. *Los Angeles & Salt Lake R. R. Co.,* 18 B. T. A. 168.

(21) In its income tax return for 1922, the petitioner claimed a deduction from gross income in the amount of $13,462.85, representing a loss alleged to have been sustained on investments in the Port Arthur Hotel Company. This issue was abandoned at the hearing. The determination of the respondent in respect of such alleged loss is approved.

(22) In the years 1923, 1924, and 1925 the petitioners incurred and paid penalties for violation of Federal statutes in the respective amounts of $121.02, $1,795.57, and $715.27. It claims that such penalties are deductible from its gross income in the several years as ordinary and necessary operating expenses. Counsel argues at length that such penalties are unavoidable and that as no moral obliquity is imputed to the petitioner or any of its agents or employees in connection therewith, the deductions should be allowed as claimed. The record discloses no facts which enable us to distinguish the situation here from that which was shown to exist in several proceedings in which we denied similar claims for deductions. On this issue the determination of the respondent is approved. *Great Northern Railway Co.,* 8 B. T. A. 225; affd., 40 Fed. (2d) 372; *Chicago, Rock Island & Pacific Ry. Co.,* 13 B. T. A. 988; *Terminal Association of St. Louis, supra.*

(23) In the year 1900, the petitioner acquired the entire issue of first mortgage bonds of the Port Arthur Channel and Dock Company of the par value of $1,655,000, in exchange for its own bonds and preferred stock, and common stock, each category having par value in the amount of $823,500. The average market prices of the

petitioner's bonds, and preferred and common stock were 65.738, 34.475, and 14.195 per cent of the par value thereof. On these facts the petitioner claims the right to amortize discount on its bonds so issued. Its theory is that the value of the bonds of the Port Arthur Channel and Dock Company was determined by the market value of the securities exchanged for them. It may be accepted as proven that the bonds so issued had a market value of 34.262 per cent below par, but this falls far short of establishing that they were issued at a discount that for Federal income tax purposes should be amortized over the life of the bonds. In financial transactions the term discount is the difference between the face value of securities disposed of for cash below par and the amount of cash received therefor. All the transactions dealt with in our decisions upon which the petitioner relies were of that nature. Whether an exchange in the circumstances stipulated could be construed as an issue of bonds at a discount is an extremely doubtful question which, under the facts herein, need not be decided. There is no evidence of the value of the Port Arthur bonds at the date of their acquisition by the petitioner, who contends that the market value of its own securities at date of exchange is determinative thereof. Cf. *Claude H. Birdsall, Executor*, 2 B. T. A. 1169. We are unable to agree with this contention. The Port Arthur bonds may have had value equal to the par value of the securities issued therefor and in that case, if the petitioner's theory is sound, its bonds would have been issued at par. On this issue the determination of the respondent is approved.

(24) The Kansas City Southern Railway Company and the Texarkana & Fort Smith Railway are the principal carriers included in the petitioner's legally consolidated income tax return. Their properties are operated as a unit, but the latter is a Texas corporation and is required to keep a separate account of operating income and expense. During the years 1922, 1923, 1924, and 1925 each company charged the other at tariff rates for the transportation of materials and supplies, the transporting carrier debiting and the receiving carrier crediting such charges to the cost of its materials and supplies. To the extent that such materials and supplies were used for current maintenance that practice had no effect on income, since the debits for service were offset by the credits for expense. To the extent of their use for betterments the charges were accounted for as a part of the cost and charged to investment accounts, and so offset no other carrier's income in the consolidated income tax return of the petitioner. In this way such charges in the years involved were entered in the respective amounts of $13,702.47, $58,747.52, $57,214.39, and $33,753.94. In the same years each of

the companies credited itself with income with the estimated cost of moving its own materials and supplies by its own lines at the rate of 5 mills per ton-mile. The average freight revenues for the same period were slightly in excess of 10 mills per ton for a mile. The parties have stipulated that at least 5 mills per ton-mile of the intercompany freight charges for the years 1922 to 1925, inclusive, is a proper charge to investment account and that the corresponding credit is analogous to credits to income. It is also stipulated that if we should find that the amount of such intercompany freight in excess of the rate of 5 mills per ton-mile does not represent taxable income, then the excess amount for each of the respective years was $6,851.23, $29,376.76, $28,607.19, and $16,876.97, or a total of $81,709.15.

Since the effect of the accounting for intercompany charges for transporting materials and supplies for use in betterments is reflected in additions to investment accounts, we think it follows that the credits involved should be regarded as taxable income. *Great Northern Railway Co.*, 8 B. T. A. 225; *Great Northern Railway Co.* v. *Commissioner*, 40 Fed. (2d) 372; *Gulf Mobile & Northern Railroad Co.*, 22 B. T. A. 233. The respondent contends that these credits to income in the years 1922 to 1925, inclusive, should be based on the regular tariff rates in the amounts set out above. The petitioner contends that the taxable income so resulting should be limited to 5 mills per ton-mile. If it had not been for the interstate feature of these transportation charges the maximum amount credited to investments would have been 7 mills per ton-mile under the regulations of the Interstate Commerce Commission. The record contains no evidence upon which we can base a finding as to actual cost of such transportation service. The regular tariff of 10 mills per ton-mile may be presumed to return a profit and to be in excess of actual cost. In the light of the regulation of the Interstate Commerce Commission and of the stipulation, we think the credits to income here involved should be based upon a charge of 7 mills per ton-mile for intercompany materials and supplies used for improvements and betterments. This adjustment will be made under Rule 50.

(25) Under the operating agreement between the petitioner and the Kansas City Terminal Company the latter was required to credit on its books monthly that proportion of net earnings due the former. In the year 1921 such credits were made in the total amount of $46,892.77. The petitioner was not advised thereof until March, 1922, and it then took such credits into its books and reported them as income in that year. The petitioner is on the accrual basis. The credits in question were accruable monthly on its books and even though it was not advised of the exact amount thereof until some

time in March, 1922, they should have been accrued as of December 31, 1921, and included in gross income for that year. On this issue the determination of the respondent is reversed.

(26) In his amended answer the respondent alleges that deductions from petitioner's income on account of amortization of discount were erroneously allowed in the years 1920, 1922, 1923, 1924, and 1925, in the respective amounts of $73,238.33, $73,009.08, $76,825.11, $83,317.69, and $97,315.67. The deductions in question should be reduced to the extent that they represent amortization of commissions and expenses in connection with sales of bonds prior to March 1, 1913. *Kansas City Southern Ry. Co. et al., supra.* See also *Chiacgo, Rock Island & Pacific Ry. Co., supra.* The expenses and commissions incurred in the sale of bonds subsequent to March 1, 1913, are amortizable ratably over the term for which the bonds are issued. *Chicago, Rock Island & Pacific Ry. Co., supra.*

In 1923, the petitioner issued and sold its equipment trust certificates of the par value of $1,620,000, incurred expense in connection therewith for commissions and other costs in the amount of $51,753.67, and realized the net amount of $1,568,256.33. This issue consisted of 15 notes for $108,000 each, all dated September, 1923, maturing serially on September 1 of each succeeding year. Due to the fact that all the items of equipment under such trust certificates were not received in 1923, but were received before the end of 1924, the petitioner charged to investment in equipment account the amount of $2,462.74, representing a portion of the issue expense. In our opinion the serial notes herein involved come within the purview of our decision holding that the expense of issuing bonds may be amortized annually over the life of the bonds. The discount and annual deduction for amortization of the notes in question should be computed in conformity with the rule laid down in *Chicago, Rock Island & Pacific Ry. Co., supra.*

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

SMITH, dissenting: I dissent from the opinion of the Board upon the issues numbered (6) and (7).

The issue numbered (6) relates to the correctness of the disallowance by the Commissioner of the deduction of $809,773.83 of the maintenance expenses of the petitioner for 1920. The Board has confirmed such disallowance in the amount of $429,821.89. The confirmation is based solely upon the fact that in 1923 the petitioner's claim for undermaintenance of ways and structures during the period of Federal control was allowed in the amount of $809,773.83.

During the period of Federal control the petitioner's properties were operated by the Director General of Railroads and its books of account were kept by that official. On March 1, 1920, the petitioner received back from the Director General of Railroads all of its properties, together with its books of account. The properties were undermaintained during the period of Federal control. The books of account did not reflect this undermaintenance. The capital accounts were in nowise affected by such undermaintenance. The petitioner, with most other railroads, filed with the Director General of Railroads claims for undermaintenance during the period of Federal control. The Director General considered these claims and in many cases made counterclaims for overmaintenance. The petitioner's claim for undermaintenance was adjudicated in 1923 and the petitioner recovered, in a lump-sum settlement of all its claims against the Director General of Railroads, $1,500,000. A breakdown of the lump-sum settlement shows that petitioner's claim for undermaintenance of ways and structures was allowed in the amount of $809,773.83 and that its claim for undermaintenance of equipment was totally disallowed.

The petitioner's books of account were kept during the period of Federal control and subsequently upon the accrual basis in accordance with rules and regulations prescribed by the Interstate Commerce Commission. In such books of account all payments for maintenance were charged as expense. In its return for 1920 the petitioner claimed the deduction from gross income of the total amount of the maintenance expenses shown by its books of account. During 1920 the petitioner had no assurance that any part of its claim for undermaintenance would be allowed. In November, 1923, the claim was finally adjusted and the petitioner was allowed its claim for undermaintenance of ways and structures in the amount above stated.

The Commissioner in auditing the petitioner's returns for 1920 and subsequent years has assumed, erroneously in my opinion (see *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, that the amount received for undermaintenance was not income of the petitioner in the year of its receipt, but, recognizing the fact that the petitioner had a gain of $809,773.83 as a resut of such allowance, has assumed that the undermaintenance of the period of Federal control was made good during the period March 1 to December 31, 1920, and upon such assumption has disallowed the deduction of a portion of the petitioner's maintenance expenses for 1920 and in this way has included in the petitioner's taxable income for 1920 the amount of $809,773.83.

The Commissioner has proceeded in the case of this petitioner the same as he has proceeded in the case of the other railroad companies.

We had the same point before us in *Terminal Railroad Association of St. Louis*, 17 B. T. A. 1135, and sustained the Commissioner because the petitioner was unable to establish, or failed to establish, before the Board that undermaintenance during the period of Federal control was not made good during the last ten months of the calendar year 1920. In the course of our opinion we stated:

The petitioner's first position is that the amounts expended for maintenance should not be decreased by any payment or allowance made by the Director General for undermaintenance; if this be declared indefensible, his secondary defense is that no such allowance was made.

It may be conceded that whatever payment or allowance was made to the petitioner for undermaintenance does not constitute income to it; it represents no more than a return to it of its original capital investment. * * *

We are of the opinion that the Commissioner must prevail in his contention. The statute (sec. 214, Revenue Act of 1918) provides that in computing net income of a taxpayer there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. We do not understand that this would permit the deduction of expenses paid or incurred by the taxpayer for which he is reimbursed. In such a case the expenses are not his, nor are they paid or incurred by him within the meaning of the statute. The taxpayer is allowed the expenses of its business borne by it and is taxed only upon its net income after its expenses have been deducted.

There is no difference in substance between a situation where the property had been properly maintained by the lessee and one where, having been under-maintained by the lessee, such undermaintenance is overcome by the lessor at the expense of the lessee. If the Director General of Railroads had expended the amount here in question and had thereby been enabled to return the properties to the petitioner free of any undermaintenance, there would be no claim that petitioner might deduct the amount so expended. Instead, the property is returned to the lessor in a condition of undermaintenance, brought into condition by such lessor and the cost thereof paid by the lessee.

In *Norfolk Southern Railroad Co.*, 22 B. T. A. 302, and *Missouri Pacific Railroad Co.*, 22 B. T. A. 267, we reversed the action of the Commissioner in disallowing a portion of the maintenance expenses for 1920, but solely upon the ground that the evidence tended to show that the undermaintenance during the period of Federal control had not been made good during the last ten months of the calendar year 1920.

I am of the opinion that the *Terminal Railroad Association of St. Louis* case lays down an entirely erroneous principle. It is that the amount received by a railroad company in settlement of its claim for undermaintenance during the period of Federal control does not constitute income in the year of receipt and that amounts charged as maintenance expenses which serve to make good the undermaintenance during the period of Federal control are not legal deductions from income. The income taxing statutes are entirely unworkable from such a standpoint. The Commissioner, proceeding

upon that theory, was sustained by the Board in the *Terminal Railroad Association of St. Louis* case, but solely upon the ground that the evidence before the Board did not rebut the assumption made by the Commissioner that the undermaintenance was made good in 1920. The Commissioner was not sustained in the case of *Norfolk Southern Railroad Co.*, *supra*, or in that of the *Missouri Pacific Railroad Co.*, *supra*. In this situation the Commissioner is absolutely at a loss to guess the year in which the disallowance from maintenance expenses shall be made. Thus, in the case of the last two companies, shall he guess that a portion of the maintenance expenses for any particular year subsequent to 1920 shall be disallowed? And is the burden on the railroad company to show that the undermaintenance for the period of Federal control in any particular amount was not made good in the tax year for which the Commissioner has disallowed a portion of the maintenance expenses?

It appears to me that the books of account of the railroad companies as kept under the regulations of the Interstate Commerce Commission reflect the true situation in these cases. They show the maintenance expenses made in any particular year. The railroad companies have a right to contend that they are legal deductions from gross income, the statute permitting the deduction from gross income of all the ordinary and necessary expenses of carrying on any trade or business. Likewise, the books of account reflect in their income the amounts which the railroads recover from the Director General of Railroads for undermaintenance. Why should not income shown from that source be included in the taxable income? Is there any provision of the taxing statute which exempts such income from tax? Section 212 of the Revenue Acts of 1918 and 1921 provides that "the net income shall be computed upon the basis of the taxpayer's annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer." Those books of account are not to be disregarded in the making of income tax returns unless "the method employed does not clearly reflect the income." The courts have many times stated that taxation is eminently practical and that it is not concerned with theoretical conceptions of income and expenses. *Eisner* v. *Macomber*, 252 U. S. 189; *Weiss* v. *Wiener*, 279 U. S. 333; *Tyler* v. *United States*, 281 U. S. 497. Clearly, in this case the Commissioner is resorting to theoretical conceptions of deductions from income in disallowing a part of petitioner's maintenance expenses upon the theory that a part of those maintenance expenses was recovered in a subsequent year. Even if it be conceded that the amount which is recovered from the Government for undermaintenance of ways and structures and equipment during the period

of Federal control is for the purpose of reimbursing the petitioner for expenditures already made or to be made to make good the undermaintenance during the period of Federal control, I am still of the opinion that the amount recovered is nevertheless a part of the taxpayer's gross income.

In 1920 the petitioner did not know whether any part of its claim for undermaintenance during the period of Federal control would be allowed. It could not await the action of the Director General of Railroads upon its claim to file its return of income for 1920, and I am of the opinion that that income tax return may not be corrected by hindsight. There can be no question but that the petitioner would be entitled to deduct from the gross income of 1920 the full amount of its maintenance expenses had there been no recovery from the Director General of Railroads. No such contention is made by the Commissioner. I am of the opinion that the deduction for maintenance expenses of 1920 is not affected by what happened in 1923.

As was noted by the Supreme Court in *Burnet* v. *Sanford & Brooks Co., supra:*

All the revenue acts which have been enacted since the adoption of the Sixteenth Amendment have uniformly assessed the tax on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period, either the calendar year, or, at the option of the taxpayer, the particular fiscal year which he may adopt. * * *

Considering the taxable year 1920 by itself, can it be doubted that the petitioner has the legal right to deduct from its gross income the total amount of its maintenance expenses?

In the instant case it is to be noted that upon the adjudication in 1923 of its claim for undermaintenance during the period of Federal control no part of its claim for undermaintenance of equipment was allowed and that the only allowance for undermaintenance was in respect of ways and structures. The Board finds that there was no overmaintenance of petitioner's ways and structures during the year 1920 based upon the amounts spent for maintenance of ways and structures during the test period, but there was only an overmaintenance of equipment. Why, then, should any part of the petitioner's expenditures for maintenance of equipment in 1920 be disallowed as a deduction from gross income by reason of the fact that in 1923 the petitioner recovered back from the Director General of Railroads an amount in respect of undermaintenance of ways and structures during the period of Federal control? Does an overmaintenance of equipment correct an undermaintenance of ways and structures? This simply goes to show the arbitrariness, the theoretical character, and the unworkability of the rule laid down by the Board for the

purpose of arriving at the correct net income of the petitioner for 1920.

With respect to issue numbered (7) it is to be noted that for many years the established accounting practice of the petitioner has been to accrue and report its income on an estimated basis. This means only that overlapping items of one month are corrected in the following month. Thus, the overlapping items of 1920 are corrected in the year 1921. I fail to see wherein the petitioner's books of account do not accurately reflect its income over a period of years. In my opinion there is no justification for rejecting the petitioner's books of account in the manner indicated in the opinion. It requires a restatement of the petitioner's tax returns for a period of years without any certainty as to whether the restatement will redound to the benefit of the Government or to the taxpayer. I think the books of account of the taxpayer upon the basis, kept correctly, reflect its net income.

MURDOCK dissents as to issue No. 20.